Garcin *v.* Garcin.

Edward H. Garcin

*v.*

Helen Spiers Garcin.

[Filed October 4th, 1901.]

1. Where a wife left her husband because he accused her of antenuptial unchastity and threatened to put a detective upon her past life—*Held*, that without satisfactory evidence of some degree of physical violence by the husband, his conduct was not such cruelty as made him and not his wife the deserter.

2. It has been the rule in this court never to grant a divorce upon the uncorroborated testimony of a party.

On petition and cross-petition for divorce.

*Messrs. Beasley & Walker,* for the petitioner.

*Mr. Robert S. Woodruff* and *Mr. James J. Cahill,* for the defendant.

REED, V. C.

Edward H. Garcin, a widower with three children, at Washington, District of Columbia, on June 1st, 1898, was married to Miss Helen Spiers.

From Washington they went to New York City, where they stayed about ten days at the Hoffman House; thence they came to the Windsor Hotel, Trenton, where Mr. Garcin had made his home; thence, somewhere about July 1st, they moved to the Columbia Hotel, at Belmar, New Jersey, where they remained during the months of July and a part of August; thence they returned to the Windsor Hotel, at Trenton, for a brief period; thence she went to Washington and Culpepper, Virginia, until he returned from Chicago, and finally, about September 10th, they began housekeeping on North Clinton street, in Trenton.

They lived there—he being absent a part of the time on business trips and she on visits to her mother, in Washington, and both on a visit together to Niagara Falls—until November 5th of the same year (1898). On that day both left Trenton together, stopping at Washington. Upon their arrival at Washington, they took a carriage and drove to the Raleigh Hotel, where he alighted, and she was driven to the apartment house in a flat in which her mother and sister lived.

She thereafter refused to return to him. After the expiration of two years he filed this petition for a divorce upon the ground of desertion.

She filed a cross-petition for divorce on the ground that, by reason of his cruel conduct, she was justified in refusing cohabitation.

The incidents of their brief marital life which led to this separation, as detailed by each of the parties, radically differ. The stories told by husband and wife are so contradictory in regard to circumstances about which there could have been no mistake that the testimony is affluent of perjury.

His account is to the effect that soon after their marriage he became suspicious that his wife was not a virgin when married. This suspicion, he says, was caused by her revelation of a knowledge of matters concerning which a virgin should have been ignorant and by her immodest behavior in his presence. The suspicion thus provoked led him, he says, to ask her if she had been guilty of intercourse with men prior to her marriage. He says that he had so asked her several times, and she, while at the Columbia Hotel, Belmar, told him that she had been intimate with men. This confession was followed by unpleasant relations between them for three or four days, when matters were smoothed over. Some time during the latter part of August—the wife having gone to Washington to visit her mother and Mr. Garcin being about to make a trip to Chicago—he telegraphed her to meet him at the Continental Hotel, Philadelphia. She met him, and they spent the night there. While there the matter of her antenuptial impurity was again brought forward by him. He says:

Garcin *v.* Garcin.

"I told her that if she did not tell me the full extent of these things that I would find out for myself; it was easy enough to get a detective to find out."

She went back to Washington and he went to Chicago, leaving her to suppose that he was going to employ a detective to look up her past life.

When he returned from Chicago his wife had gone to Culpepper, Virginia, her old home, where he joined her. There he produced a letter, purporting to be written to him by a Chicago detective, and also a folded paper, upon which was endorsed a pretended detective's report upon his wife's previous life. He admits that both were fabricated by himself. He says that he exhibited these papers to her and said:

"Now, if you want to confess this whole thing do so now, or otherwise I will read these papers and find it all out. * * * She said that she would tell me all if I would give her those papers and not read them."

He says that she then confessed to her antenuptial connection with two men, and he then destroyed or gave the papers to her to destroy. This alleged confession was followed by a frenzy on his part. Peace followed, for this was before they began housekeeping. He says that they had another unpleasantness in October over the confessions, but it was adjusted, and they thereafter made a trip to Niagara Falls together. He says that on November 4th they had a recapitulation of the whole business, with an additional confession. He says:

"She was very contrite and I did not know what to do about it. We decided there should be no scandal and that I would take her to Washington to her mother and sister and come back and see her and see whether it was possible for me to forgive her and live with her again."

He went with her to Washington, left her there, but afterwards urged her to return to him, which, as I have observed, she refused to do. This is the husband's account of the incidents which led to their separation on November 5th.

The wife sets up that she was compelled to leave him because of his cruelty. She is a lady of fragile physique and manifestly

of a nervous temperament. She says that he had no considera-
tion for her in the exercise of his marital privileges; that by
his excessive indulgence, regardless of her physical condition,
her health was impaired, and that he made comparisons between
her and his first wife, which were very painful to the defendant.
She says that he was a habitual drinker of liquor and was some-
times drunk; that he was coarse in his treatment of her, using
profane language, and that he was guilty of physical violence—
*i. e.,* slapping, striking, choking, kicking and dragging her by
the hair; that the last occasion was just before she went to Wash-
ington with him on November 5th. She says that he was jealous
of her, and accused her of intimacy with other men; that he
.threatened to put a detective upon her past life; that he pre-
sented a pretended report, which he afterwards destroyed. She
denies that she ever made any confession to him, and insists that
the sole cause of her refusal to return to him was his cruel treat-
ment. He, on the other hand, denies that he was guilty of sexual
abuse or that he ever struck, choked or kicked her. Indeed, he
denies every charge, except that he accused her of (inquired of
her about, as he puts it) antenuptial unchastity.

The testimony respecting his physical cruelty, whether sexual
or otherwise, is that of the wife alone. She says that the first
time that he ever struck her was after their return from Cul-
pepper. They had been driving during the day; Mr. Garcin had
been drinking heavily, and at night began behaving badly, when
she said to him:

"Your conduct to-day has been ungentlemanly, and it makes me miser-
able to think that you can be so unkind and behave so badly and so un-
gentlemanly. · When I said that, he said, 'Look out, I am going to choke
you.' I said, 'Ned, you would not hurt me,' but his eyes were looking so
wild and with such a gleam in his eyes that I was beginning to be afraid
of him; and he rushed up to me and caught me by the neck and held me
so that my tongue hung out of my mouth, and at last he dropped his
hands and then he seemed to repent it, for he said, 'I don't know what
made me do it.' Just then I tried to escape from the room and go upstairs,
but he forced me back; he got hold of me by the shoulders and threw me
down in the bay window, and all the time he was calling me low, indecent
names; such names you cannot repeat. After throwing me on the floor in
the bay window he kicked me by the side here; and then I think he took
me by the hair and dragged me from the library window to the threshold
of the door by the hair. I screamed and lay there almost unconscious.

Garcin *v.* Garcin.

When I came to myself again, I picked myself up and went up the steps and went to bed. I don't know how long it was before Mr. Garcin came upstairs, but when he did come he was very repentant and called himself a coward and a brute for striking a little woman like me; and because he was so drunk that night I forgave him for what he had done."

One night, she says, he brought some man home with him. She proceeds to detail what occurred substantially as follows:

"I heard Garcin say to him, 'come in,' and then I heard him say, 'wait there and I will see.' I was on the back stairs and saw Garcin go into the cellar, and when he came up the man was gone. Garcin was drunk and was in a rage because the man had gone without saying 'good-night.' He exclaimed, 'I will kill him!' and then turned on me and said, 'Madame, it is your fault that the man left the house without saying "good-night;" it was your fault.' He kept on raving and saying the most horrible words, and grabbed me by the hair and hurt me so I screamed. Miriam [Mr. Garcin's daughter] rushed out and said, 'Mamma, what is the matter?' and I said, 'Go back to bed, Miriam, I have eaten too much supper.' I did not tell the child what was the matter. He begged of me not to tell anybody about it, not to tell my brother. When he would do that he would always beg my pardon and call himself a brute.'"

She says that while he and she were staying at Barlow, Virginia, he, while drunk, dashed her against the bedpost. The last episode of this kind, she says, occurred shortly before they separated. This is her account of it, in substance, reduced from the examination and cross-examination:

"It was early in the morning. He had kept me awake as usual. I was not feeling well. He accused me of being a woman without virtue. I denied it, and then he said something exceedingly repulsive. I told him that he had brought these accusations against me and that they were all false, and I got excited and called him a beast. Then he struck me on the cheek and said, 'Now, what do you think of me?' I said, 'You are a coward.' Then he began to strike me all over the body—not over the face—over the head and over the body. I think I screamed. I told him that that ended it; that I would never be his wife again, and I would make his case public, and he told me that if I did not shut my mouth he would choke me, and he dashed up to me and began choking me. I think this was two days before I left him."

These are the incidents related by the defendant where physical violence was used by the petitioner. The petitioner denies that he ever used physical violence. It appears that these scenes oc-

curred, if at all, while they were living on North Clinton street. A Miss Headspeth, employed as governess for the children, was a member of the family during this period. She says she never witnessed any scenes of the kind, and that the Garcins were loving and affectionate. She says that on the morning of November 5th—the day of their last trip to Washington—Mrs. Garcin came around the breakfast table and sat on the arm of his chair, with her arms around his neck. Miss Headspeth had a room next to the room of these parties for the first two weeks they were housekeeping. After that her room was at the back of the house, with a room intervening. She usually retired about ten o'clock. As already remarked, the defendant's case so far rests upon her testimony alone. No one else testifies that he witnessed or heard anything which indicated a rupture between the parties or saw upon the defendant any indication of physical violence. The charge of sexual abuse rests also entirely upon her. testimony— denied by his.

Leaving this phase of the case for the moment, I will turn to its other remarkable feature. It is undenied that Mr. Garcin, beginning shortly after their marriage and ending just before their separation, repeatedly accused Mrs. Garcin of antenuptial impurity. Did he think these charges true? This involves a solution of the question whether she did or did not confess to him that she had been unchaste before her marriage. The answer to this question is important, also, in ascertaining whether a confession, made just before November 5th, was the cause of her departure for Washington on that day.

The burden of proof is upon him, in the face of the denial of the defendant that she ever confessed.

His account of what he styles her first confession, made at Belmar late in July or early in August, is as follows:

"I asked her certain questions regarding certain men that she had been engaged to or been with—had been to balls, dances and parties, driving and other excursions of like nature. I think she had been engaged to two. I asked her why it was she knew so much about things that I did not think came within the province of a virgin to know. For one thing I asked her whether she was or was not a virgin when I married her. I did not ask about any man. She said that she had been guilty of indiscretions. I don't know that she said she had been guilty of indiscretions at first, but

Garcin *v.* Garcin.

she told me if I would tell her the name of the man, she would tell me whether it was or not. She said she was a good woman, and she said, 'If you will tell me the name or the names of the man, I will tell you whether it is so or not." These are her exact words."

He thus details, on cross-examination, the words of his wife, which, upon his examination-in-chief, he has styled a confession.

The next episode he details respecting the alleged confessions occurred when he threatened to put a detective upon her past life. He first says that he cannot fix the time or place. Subsequently he says it was on the occasion (already mentioned) when she, at his request, met him at the Continental Hotel, and fixes the date as about August 20th. What he said to her has been already detailed. He threatened, he says, that if she did not tell him all he would employ a detective. He then says:

"I think she told me 'that was all,' or if I could tell her the name of the man and she would tell me whether it was so or not. I think she repeated that to me. There was no quarreling or disagreeing on that score at all."

He then went to Chicago and she returned to Washington. While at Culpepper he received a letter, directed to him at Chicago and forwarded to him, in which letter she said, "Don't let that man go spying around and asking about me and send sister those papers and I will send them to you." There is no date to this letter. On August 24th she wrote him a letter, which, he says, he received while still at Chicago. In it she said:

"I have not heard from you since you have been in Chicago. Please write to me and if you have not already sent those papers, send them to me and not to sister."

On August 25th he wrote to her from Chicago. He tells her he has bought her a watch, rallies her about having no time to answer his daily letters—he having received but three letters from her since the preceding Thursday. The next meeting was at Culpepper, where he went from Chicago. He says:

"I found her some time during the day and spent the night with her, and it was during that night that I told her that I had the report of the de-

tective; upon which she gave me the balance of the confession and then I tore up the papers, after showing her that there was no detective business in it at all. The first thing I said was that I had found out the same of the man. She asked me what his name was. I told her that I did not know, but I have these papers here which I have not read yet, and I said. 'Now, if you want to confess this whole thing do so now or otherwise I will read these papers and find it all out.' She said that she would tell me all if I would give her those papers and not read them. Then she told me all."

He then details her story of having been seduced by one man and intimate with another. He says that he then gave her the papers, which were nothing but blank papers folded and endorsed. He says that he himself destroyed the letter purporting to be from a detective, after reading it to her. The next day he drove her twenty miles in the country, and stayed with her there three or four days. He says that he did not feel jovial, but there was no recrimination going on. He says that they had a great unpleasantness in October, just before their trip to Niagara Falls, already mentioned. This arose, he says, from a reconfession of her intimacy with a man, she having at Culpepper confessed it, and afterwards at Culpepper retracted it. The unpleasantness was so bad that she went down to Washington and stayed there several days. He wrote her, stating that he would forgive her, and asked her to meet him at the railway station in Washington. She and her sister met him; she, against the wishes of her sister, returned with him, and then they went on the trip to the falls and the lakes.

They returned to Trenton, had another unpleasantness, resulting from another confession, already mentioned, and then she went to Washington on November 5th.

Mrs. Garcin admits that he told her at the Continental Hotel that he was going to put a detective upon her past life. She says that she was disgusted with him, and said to him, "Certainly, have a detective if you want one;" and that she received a letter from him while he was at Chicago, saying that he had some papers.

She says that he came from Chicago directly to Culpepper, where she was staying at her grandfather's home. He had been drinking heavily. The first night he showed her a paper, which

Garcin *v.* Garcin.

he said was the report of a detective. He was drunk. He said that he had found out these things against her. He kept on saying so, and finally saw that she did not take much stock in it, and he acknowledged, very shortly after, that it was not a detective's report—that he had made it up himself.

She says that he tore up the pretended report—whether that night or not she does not know—but it was afterwards found by her brother and patched up. It is introduced in the cause as *Exhibit P 3, 4, 5*. It is not a blank paper folded and endorsed, but a report in the handwriting of Mr. Garcin.

The letter and report, upon their face, show conclusively that, up to that time, no confession of intimacy with any particular person had been made by his wife.

Nor does Mr. Garcin's testimony otherwise show that any such confession was theretofore made. All that he details of the conversation is that she said, "Name the man and I will tell you whether it is so;" and this remark, he says, was coupled with her assertion, at Belmar, that she was a good woman.

I do not think it proved that she ever confessed to antenuptial impurity. It is, indeed, possible that she may have confessed to what was not, in fact, true. Mr. Garcin says that he did not, and does not, know whether they were true—that he did not know what to believe. Confessions by a wife are regarded by courts with the greatest circumspection, more particularly when made to, or in the presence of, the husband.

This circumspection is grounded upon experience. It rests upon the knowledge that these confessions have been so made, in instances when it was pressed upon the wife, that such a confession was desired and expected, and that if not made, she would be still considered guilty, but unrepentant; and if made, she would be forgiven and domestic peace would return. But it is not proved to my satisfaction that she confessed at all to having been unchaste. There is not a hint that she was ever even immodest in behavior. Her husband said she was modest, except with him. The charges he made against her and her alleged confessions are probably the coinage of his fancy. Several considerations point to this conclusion. The testimony, I think, shows that Mr. Garcin had a low opinion of the chastity of

women. It shows also that he was accustomed to use intoxicating liquors, and on occasions to use them freely; and on such occasions he was inconsiderate and free in the expression of his views.

Neither of these propositions rest alone upon the testimony of the wife. Miss Mary D. Spiers, a sister of Mrs. Garcin, tells of a visit he made to Washington in July, when he invited her to dine with him at the Shoreham.

At this dinner he drank, and gave her an account of his powers of fascinating women, and said that he did not believe there was a virtuous woman in the world, and told a story about his first wife's sister.

: In August, at the invitation of her sister, Miss Spiers went to Belmar to visit the Garcins. At the close of the visit Mr. Garcin took them, with others, on a trip to Manhattan Beach and New York City. Mrs. Garcin and her sister stayed at the Imperial Hotel. After they had dined in the evening, and—as they both say—Mr. Garcin had drank deeply, he came into their room and began a tirade directed against Mrs. Garcin. He called her foul names, and said that he had married two women of the same kind. Miss Spiers said that she insisted on leaving the hotel early in the morning, and they did leave for Trenton. When at the Windsor Hotel, in Trenton, he said that all that he had said about his first wife was a lie.

Nor does the evidence of his drinking habit rest upon the testimony of Mrs. Garcin alone, nor upon that of her sister. Mr. Garcin admits that he has been accustomed to drink. He says that, as a rule, he never drinks before twelve o'clock. He is not a drinker who exhibits his intoxication on the streets, or in his business conduct, or even at home, except upon occasions. But upon occasions he drank freely. There is in the testimony an account of a visit he made late at night to the apartment house where his wife was staying with her mother and sister. This was, he thinks, on November 7th. Mrs. Garcin says that he was drunk. He admits that he had several drinks that evening with a customer. She says that he was drunk at Culpepper. He denies it, but admits that at Barlow he and a friend went back in the mountains and got a bottle or jug of whiskey, which

Garcin *v.* Garcin.

they drank—taking several drinks a day. He was seen to enter a saloon in Culpepper several times a day.

On cross-examination he was told that he had said that he was never drunk any night during his married life. He replied, "When did I say I was never drunk any night during my married life?" He did not deny that he had been. Now, the result of his occasional overindulgence, coupled with his low opinion of the ability or inclination of women to resist the importunities of men, was probably that, upon these occasions, he felt and expressed a desire to know her former relations with men. She was young and attractive—her portrait having been published as one of the beautiful women at Belmar. He knew that she would have naturally received attentions from gentlemen. He speaks of one or two to whom she had been previously engaged, although there is nothing to show that she had been previously engaged. except his account of what was said at the time of the alleged confessions. His vanity and his suspicious nature, excited by drink, led him to be inquisitive about her former suitors and acquaintances, and to hint at, if not directly accuse her of, previous unchastity. Upon such an accusation, she would naturally inquire, "With whom do·you charge me with being intimate? Name him or them." Her questions he then or later tortured into a confession, for the purpose of exhibiting a cause for her separation from him.

Apart from the wife's emphatic denial that she ever made the alleged confessions, there are two or three things to be mentioned.

Mr. Garcin says that he told his wife's mother and sister that his wife had confessed. When asked why he told them, he has no answer. The mother was not sworn, because of illness, but the sister denies that he ever said a word to her about it. Miss Spiers says that the first she knew of the charges and of the detective business was from her sister, who told her about it when she received a letter from Chicago. Her sister then said that Garcin had put a detective on her, and that she had written to him to send the papers to me.

Again, Miss Spiers testifies that she saw him at the Washington railroad station, at the time in October when he wrote to his wife to meet him. His wife had gone to Washington, he says, because

Garcin *v.* Garcin.

of her confessing a matter which she had once confessed and then recalled. Miss Spiers, as already observed, had been told of the detective business, and of what else does not appear. She was set against her sister's resumption of her married life. Miss Spiers says that Garcin came in the waiting-room and kissed his wife and nodded to witness. He said to his wife, "Did you bring your trunk?" and she said, "No." Witness said, "She shall not bring her trunks until I know you will treat her better," and told him he was "a scoundrel, a coward and a moral leper." He coaxed her to come back, and said it would never be his fault again if she left. After considerable talk the sisters went back home, and Mrs. Garcin got her trunk and went with her husband. According to Miss Spiers' account of the interview nothing was said about the wife's confession. His account of this scene is this: He says—after telling how incensed Miss Spiers was at something he did not know what—that he said to her, "Has Helen told you about such and such things?"

She said, "Yes," and then broke out:

"You have no right to bring up these things against my sister; you are no better than she is; a woman has as much right to do this sort of thing as a man has, and you are as bad as she is and all men are bad, and you are one of the worst men I know."

This, he swears, was said by Miss Spiers in the waiting-room at the railroad station. It contained a statement of woman's rights hardly consistent with Miss Spiers' appearance and breeding, and is, I am satisfied, a distortion of what she really said.

Again, he says that he never dreamed of such a thing as putting a detective at work, and when asked what was his purpose in forcing a confession, said that he hoped to establish the fact that she was not as bad as she said she was; but again said that he thought there was more in her past life than she had revealed. Again, he said that the last trip to Washington was the result of her last confession—her recapitulation, as he styles it. He said, on his cross-examination, as already stated, that she was to stay there until he decided whether he would forgive her. He had already said, "I did not know she was going to remain down

there; I did not know what she was going to do; I thought she was coming back to Trenton—back to me."

After November 5th he says that he wished an interview with his wife apart from the presence of her mother and sister. This was because he knew, he says, that they were inimicable to him. Yet, by his theory of the separation, he himself sent her into this inimical household to await his sentence.

Again, the note he wrote her on November 7th, asking her to send him a flask, and her reply, does not indicate that she was awaiting his forgiveness. On the other hand, the query arises, Why did the wife, if not guilty, write fond letters to him after he had accused her and told her that he intended to put a detective upon her past? After their meeting at the Continental Hotel she wrote to him, telling him what a noble man he was and how insignificant she was, but knew her love would compensate for it all. She asks him to stop the man's spying and questioning people about her. She tells him, first, to send the papers to her sister, and then, not to her sister, but to herself. Why all this gush to a man who had abused her sexually, swore at her, accused her of unchastity, and finally put a detective upon her, if she was not afraid that there was something to discover?

I do not think it essential to assume her guilt, for the purpose of finding a reason for these letters.

She was put in a very trying dilemma. It was far from agreeable to her to think that someone was inquiring—perhaps in the neighborhood where she had lived—concerning her maiden life, and was, by the nature of the inquiries, provoking suspicion, gossip and scandal. She naturally wished to prevent it, and so wrote the gushing letters to placate him and induce him to forego his purpose. If, however, he did get a report, she, like any other person in her place, would be curious to see it.

Considering all the circumstances, it is not proven that she ever confessed to him that she had been unchaste.

Therefore, the case stands thus: He had, during the period of their cohabitation, when intoxicated, repeatedly charged her with antenuptial unchastity, which charges led, undoubtedly, to painful scenes between them. Even if she had confessed this, as he insists, it is impossible to justify his repeated revival of

the subject, after repeated forgiveness and reconciliations. It would still have been unmanly and cruel. But these repeated charges, based upon his suspicions alone, can with difficulty be adequately censured. The humiliation and torture thus inflicted were calculated to make cohabitation almost unendurable to a woman of sensibility and self-respect.

But such charges alone seem not to bring the husband's conduct within the definition of extreme cruelty.

Mr. Bishop observes that a groundless and malicious charge by a husband against his wife's chastity, though not ordinarily deemed quite sufficient standing completely alone, is, when the foundation for its admission is so laid, deemed a gross act of cruelty *almost* enough of itself. *1 Bish. Mar. & D.* ¶ *726.*

In *Smith* v. *Smith, 13 Stew. Eq. 566,* the husband charged his wife with incest, and a divorce was decreed to her; but the charge was accompanied with slight acts of personal violence. In *Graecen* v. *Graecen, 1 Gr. Ch. 459,* there were threats and menances of personal violence, calculated to put the wife in dread of personal injury. In *Close* v. *Close, 10 C. E. Gr. 528,* the husband had repeatedly applied to the wife the most revolting epithets—among others, bitch, sow and whore; but there were also acts of personal violence. It was left, as a query in the court of appeals, whether relief would be granted in a case of extreme hardship, without actual or apprehended violence. There may be an instance, as in *Milner* v. *Milner, 4 Swab. & T. 240,* where the husband publicly branded his wife as a prostitute; or other instances where the husband, by verbal taunts and accusations, so tortured his wife as to lead to mental and physical illness, which would, in themselves, amount to cruelty.

The present is not such a case.

Nevertheless, if it is proved that, in addition to his accusations, he visited upon his wife physical violence, although the latter might not alone amount to extreme cruelty, both together may.

Said Chancellor Zabriskie, in *Thomas* v. *Thomas, 5 C. E. Gr. 97, 99:* "The actual violence in this case is not very great—not such as, if repeated, would cause danger to life or limb." But inasmuch as the husband had spit in his wife's face and accused her of a want of chastity, he granted a divorce.

Garcin *v.* Garcin.

In *Smith* v. *Smith, supra,* a charge of incest, with slight acts of violence and reasonable apprehension of bodily harm, were held to be sufficient ground for a divorce.

If the acts sworn to by the defendant are established by legal evidence her case is proven.

The question is whether such acts of physical violence are proved.

As I have already observed, the evidence of their occurrence rests entirely upon the word of the defendant. In addition to this, there is testimony that she so acted and spoke as to refute the facts to which she testified. Her acts are those mentioned by the governess and the petitioner, namely, that on the very morning of her departure she manifested her affection for her husband by sitting on the arm of his chair, putting her arms around his neck and kissing him. Her words were those spoken to Mr. Lowthorp, who, with her husband, visited her at her brother's, in Philadelphia, on November 12th. In response to a question by Mr. Lowthorp she said that her husband had never been cruel to her. She admits this, and explains it by saying that she had promised her husband, before leaving him, not to expose the particulars of their marital differences. Her alleged conduct on the morning of November 5th she denies. Then, again, it is to be remarked that the governess must have been in the house when the acts of physical violence occurred, and she says that she heard nothing of them.

The occurrences narrated by the defendant might have occurred without arresting the attention of the governess in her room. The fact that the defendant made no complaint, and did not make an exhibition of any bruises, is explicable on the theory that she had not then resolved to finally separate from her husband, and so did not wish, from motives of pride, to publish her marital troubles. If the question were one of moral conviction merely, I would say that it is more probable that these scenes occurred than that the defendant fabricated the details of the account which she gives. If they are invented, it is strange that she did not place one or more during the period when her sister was visiting her, so as to have corroborative testimony.

They were scenes which were not unlikely to occur. Take a

husband intoxicated, suspicious, jealous, accusative, and a high-spirited wife, and the occurrence of these acts were not at all improbable.

Her reticence when questioned by Mr. Lowthorp was not strange. He was a stranger to her, to whom she did not wish to air her grievance.

When she went to Washington on November 5th I do not think that she had finally determined to separate from him.

Only five months before she had married a man of good family, of means and of supposedly high character. In spite of her marital troubles, it was a serious thing to leave him, and become the target of the gossip of her acquaintances.

The position of a married woman who lives apart from her husband is a very unpleasant one.

So she undoubtedly hesitated to take the step, and while still undetermined, did all she could to disarm his suspicions. She finally determined upon a separation, I think, after consultation with her mother and sister, and was strongly urged to do so by them.

The fact that she concluded to take this step, under the conditions, indicates that something in her married life made further cohibition more painful to her than the mortification of separation.

But while her unaided story of his physical violence may create a moral conviction of its truth, it does not, under the rule established in this state, amount to legal proof.

So far as appears, no other person saw these acts of violence, heard any threats or excited language, saw any marks upon her person, or heard any confession from him or complaint from her. It lacks corroboration in any material point.

Elsewhere divorces have been granted upon the uncorroborated testimony of a party.

In Pennsylvania a jury found a verdict in favor of a divorce upon the testimony of the plaintiff, contradicted by that of the defendant, and it was permitted to stand. "Sometimes," said Mr. Justice Gray, in *Robbins* v. *Robbins, 100 Mass. 150,* "no other evidence exists or can be obtained. The parties are made competent witnesses by statute, and there is no law to prevent

Garcin v. Garcin.

the finding of a fact upon the testimony of a party whose credibility and good faith are satisfactorily established." For the same reasons a marriage was annulled for impotence upon the uncorroborated testimony of the wife, the husband not appearing, in *F.* v. *D., 4 Swab. & T. 86.*

"Yet," says Mr. Bishop, "looking to what is practically just and safe in the administration of our divorce laws plainly, the circumstances must be rare in which a court or jury ought to find what will divorce the parties, even on the testimony of both, where nothing in any degree confirmatory of it appears." He further says: "Some courts, particularly in New Jersey, have an inflexible rule never to grant a divorce on the mere uncorroborated testimony of a party." *2 Bish. Mar. & D. ¶ 284.*

The accuracy of this statement is apparent in the following line of cases: *Woodworth* v. *Woodworth, 6 C. E. Gr. 251; Palmer* v *Palmer, 7 C. E. Gr. 88; Tate* v. *Tate, 11 C. E. Gr. 55; Shaflo* v. *Shafto, 1 Stew. Eq. 34; Doughty* v. *Doughty, 5 Stew. Eq. 32; Sandford* v. *Sandford, 5 Stew. Eq. 420; Franz* v. *Franz, 5 Stew. Eq. 483; McShane* v. *McShane, 18 Stew. Eq. 341; Herold* v. *Herold, 2 Dick. Ch. Rep. 210; Weigel* v. *Weigel, 15 Dick. Ch. Rep. 322; Moak* v. *Moak, 48 Atl. Rep. 394.*

It is true the cruel treatment by her husband is set up by the wife, not merely as a ground for a divorce *a mensa,* but it is set up as a ground for a divorce from him *a vinculo,* upon the theory that he, by his abuse, compelled her to leave him.

The same kind of testimony, however, of such abusive treatment is requisite in the one case as in the other; and the extreme cruelty must be established by evidence of the same degree of probative force. In the absence of corroboration, I do not think it legally proved by the defendant's testimony alone that he deserted her.

I am therefore constrained to advise a decree for the complainant upon the ground of desertion.