PEOPLE *v.* IMMONEN.

1. STATUTES—CONSTRUCTION—CRIMINAL LAW.
   Determination as to the constitutionality of a penal statute must be made from a proper point of view and without ignoring the legislative purpose; by considering the thing forbidden as a whole and not dissecting it into a multitude of parts and from a finding that no one of them can constitute a wrong which may be prohibited, conclude that the whole course of conduct cannot be made an offense.

2. BREACH OF THE PEACE—RED FLAG—PUBLIC ASSEMBLY.
   Record *held*, to present case where red flag was displayed at a public assembly (Act No. 328, § 48, Pub. Acts 1931).

3. EVIDENCE—JUDICIAL NOTICE—RED FLAG—ANARCHY.
   Display of a red flag at a public assembly in manner forbidden by statute is as emblematic of anarchy as the stars and stripes are of freedom and courts will take judicial notice of such matters (Act No. 328, § 48, Pub. Acts 1931).

4. BREACH OF THE PEACE—RED FLAG—POLICE POWER—STATUTES.
   Since the red flag is not an emblem of peaceful means of accomplishing governmental revolution but a challenge to the use of force and resort to destruction and when used in manner forbidden by statute causes breaches of the public peace, the legislature in the exercise of police power may forbid the display of the red flag in any public assembly, parade or demonstration (Act No. 328, § 48, Pub. Acts 1931).

5. CONSTITUTIONAL LAW—POLICE POWER—PUBLIC PEACE, MORALS, SAFETY AND·HEALTH.
   Police power as an attribute of sovereignty includes the power to enact such legislation as is deemed essential for protection of the public peace, good order, morals, safety and health.

6. SAME—PEACEABLE ASSEMBLY—FREEDOM OF SPEECH—RED FLAG.
   Statute penalizing those who display a red flag in any public assembly does not interfere with the right of citizens to peaceably assemble and consult relative to the common welfare nor impair freedom of speech, assuming display of flag is tanta-

mount to the expressions of speech, within the meaning of the Constitution (Const. 1908, art. 2, §§ 2, 4; Act No. 328, § 48, Pub. Acts 1931).

7. SAME—FREE SPEECH NOT AN ABSOLUTE RIGHT.

The right of free speech is not an absolute one and the State, in the exercise of its police power, may punish the abuse of this freedom (Const. 1908, art. 2, § 4).

8. SAME—FREE SPEECH—RED FLAG—INTENT.

Prohibition of the display of a red flag in a public assembly, parade or demonstration does not infringe the right of free speech because of the fixed symbolical significance of such display that it is an argument in favor of sedition, sabotage and direct action in political matters notwithstanding avowed purpose of advocate to the contrary or assertion negativing intent to violate statute (Const. 1908, art. 2, § 4; Act No. 328, § 48, Pub. Acts 1931).

9. SAME—DUE PROCESS—STATUTES—PRESUMPTIONS.

Statute providing that display of a red flag at a public assembly, parade or demonstration shall be considered as *prima facie* evidence of its use as an emblem of anarchy merely decrees what is confessedly inherent in, and an essential element of, the course of conduct forbidden and made criminal and prescribes an appropriate rule of evidence, not a presumption of guilt (Act No. 328, § 48, Pub. Acts 1931).

10. SAME—STATUTES—RED FLAG.

Statute forbidding display of red flag in public assembly, parade or demonstration *held*, not violative of 14th Amendment to Constitution of the United States as being ambiguous, vague, indefinite, discriminatory or a denial of due process (Act No. 328, § 48, Pub. Acts 1931).

11. CRIMINAL LAW—RED FLAG—QUESTION FOR JURY.

In prosecution for violation of statute penalizing those who display red flag in a public assembly, parade or demonstration, evidence presented *held*, sufficient to make guilt or innocence of accused an issue of fact for jury (Act No. 328, § 48, Pub. Acts 1931).

12. TRIAL—ERRONEOUS CONSTRUCTION OF STATUTE—IRRELEVANT ISSUE —PREJUDICIAL TESTIMONY—INSTRUCTIONS.

Construction of statute penalizing one who displayed a red flag in a public assembly, parade or demonstration as requiring

finding by jury that such red flag was used as an emblem of anarchy which resulted in presentation of issue not in the case, admission of prejudicial testimony over objection and prejudicial charge *held*, reversible error (Act No. 328, § 48, Pub. Acts 1931).

13. Appeal and Error—Requests to Charge.

Whether or not failure to give proper requests to charge constituted reversible error is not decided on appeal where case was reversed on other grounds and on retrial similar requests might or might not be proper, depending on record made therein.

Appeal from Alger; Runnels (Herbert W.), J. Submitted October 11, 1934. (Docket No. 122, Calendar No. 37,639.) Decided May 17, 1935.

Unto Edward Immonen and Eric Fahle Burman were convicted of displaying a red flag contrary to Act No. 328, § 48, Pub. Acts 1931. Reversed, with new trial.

*Henry Paull (Maurice Sugar,* of counsel), for appellants.

*Patrick H. O'Brien,* Attorney General, *Richard E. O'Brien,* Prosecuting Attorney, and *John J. O'Hara,* Special Assistant Prosecuting Attorney, for the people.

North, J. This is an appeal by Unto Edward Immonen and Eric Fahle Burman who were convicted of and sentenced for violating section 48 of the Michigan penal code (Act No. 328, § 48, Pub. Acts 1931) which reads:

"Display of red flag—Any person who shall display a red flag in any public assembly, parade or demonstration in this State is guilty of a felony.

"The use of such a flag at any such assembly, parade or demonstration shall be considered as *prima facie* evidence of its use as an emblem of anarchy."

In the summer of 1933 through the activities of representatives of several organizations a children's camp was organized and maintained for a period of two weeks at Eben Junction in Alger county. The Eben Educational Society granted the use of its hall incident to the camp program. By some this hall was referred to as the Community building, by others as the Communist hall. About 50 children between 9 and 16 years of age attended the camp. Some paid a small fee, others attended without charge. Their time was occupied by class work and athletic activities. To some extent discipline among the children was maintained by means of self-imposed government. Defendant Immonen and his wife, Ruth Lake Immonen, were appointed to supervise the sports and physical educational activities. Defendant Burman was the manager of a cooperative store in the immediate vicinity of the camp. He furnished supplies and appeared to take an interest in the camp program; although he denied having such interest.

On August 5 and 6, 1933, a red flag was flown from the camp flagpole in the immediate vicinity of the camp building and close to the township highway. There is testimony that at a meeting of the children they decided to display a red flag at the camp. Neither of defendants were present at this meeting. The flag was made by the girls attending the camp. "It was a red flag with a scythe in it and a hammer; a white scythe and a white hammer on a red cloth." The flag was first observed by defendant Immonen on the morning of August 5th flying from the pole

which had been erected by other camp attachés. The flying of this flag at the camp was reported to deputy sheriff Peter Arsenault, at Munising. This officer together with another deputy sheriff and other men went to the camp and talked with the persons who appeared to be in charge. Immonen being pointed out to Arsenault, the latter approached Immonen and said: "What are you fellows flying this red flag for; don't you know it is against the law?" The officer thereupon told Immonen that they wanted the flag taken down and that they would give him 30 minutes in which to do so. Immonen said: "Suppose it doesn't come down;" and to this the officer replied: "We will see it is taken down." Thereupon Arsenault and the men with him left the camp in their automobile but stopped when a short distance away in the vicinity of Burman's store, evidently to await results. They were then approximately 400 feet from the camp and in sight of the flag. While the officer and his companions were sitting in the car defendant Burman approached them and said: "What the hell business is it of you fellows to interfere with the flag?" Arsenault replied: "It is this much business, if you want to fly a flag you fly an American flag." Thereupon Burman said: "Well, I will show you," or as later testified by the witness, · "We will show you what business it is," or "What business we have flying a red flag." Burman then left and went into his store. The last above quoted testimony was given by deputy sheriff Arsenault. Defendant Burman's version of the incident as covered in his testimony is as follows:

"Well, the first question I asked was if they were interested in that flag. Someone replied that they were. Then I asked them what their opinion or idea was about the flag, I meant. I didn't mention the

flag but what their idea was about—someone answered from the car that if any flag is flying it has got to be the American flag. Then I asked the question: Haven't any society a right to fly any emblem in their affairs in their private affairs or assemblies, what they wish, and one man from the back seat replied, 'Not in this State.' Then the driver (Mr. Arsenault) jumped out and walked towards me in a threatening manner.''

Another witness quotes defendant Burman as saying:

''Well, the other societies they can have their flags up. Why can't we have ours?''

At the time of the above noted conversation members of the State police had arrived at the camp. They chopped or pushed down the flagpole and took possession of the flag. When the police left the camp Immonen walked down to the cooperative store and there engaged in an argument relative to the flag. Other members of the camp immediately re-erected the flagpole and some of the girls sewed four red bandana handkerchiefs together, and this improvised flag was promptly flown from the camp flagstaff. With the exception of one witness the testimony is that Immonen took no part in the actual work of re-erecting the flagpole and again displaying the flag, but he admits he was aware at the time that this activity was going on at the camp; and did not interfere or advise against it. One witness testified that Immonen directed the children in putting up the pole and again flying the flag.

On the following day the red flag was again flying at the camp. The sheriff of Alger county and State police arrived there a little before noon. On this occasion the pole was taken down and cut into pieces and the improvised flag seized. The officers went

into the camp building and made some search. While they were there defendant Burman, having been informed of their presence, came from his living rooms over the cooperative store, entered the camp building and came in contact with the sheriff. The latter testified to the following conversation between them:

"I said to Mr. Burman, 'You were notified yesterday about this red flag flying here, wasn't you?' and he says to me, he says, 'What the hell business have you got in here?' He says, 'What business of yours is it, taking the flag down?'

"'Now,' I says, 'Burman, you were notified yesterday about this flag and my officers had a conflict with you yesterday about this, knowing that it was against the State law to fly this flag it is flying again. I am putting you under arrest.'"

Defendant Burman's version of the conversation is as follows:

"I made a common greeting to him—'hello,' and he replied the same way. After that the sheriff asked me if I was in charge of this. I told him, 'No, I am not; I don't have anything to do with it.' Then he asked me if I am not the leader around here, and I replied, 'To my knowledge I don't consider myself a leader.'"

Some of the officers went into an office room in the southwest portion of the hall where they came in contact with defendant Immonen. The sheriff testified in substance that he asked Immonen what was the idea of this flag raising here after being notified yesterday not to raise the flag. There was no reply to this question but at this time Immonen admitted he was the instructor at the camp. On this phase of the record we quote the following from the testimony of defendant Immonen:

"The sheriff came in and he asked me if I was one of the instructors and I nodded. I was sitting at the table and the typewriter was at my side. And right behind the sheriff one of the troopers, the sergeant, came in. * * * And the trooper asked me who was in charge and I refused to answer, because I didn't know for sure who really was in charge and at that he hit me in the pit of the stomach, which made me feel rather dizzy and I sat down for a while."

Both Immonen and Burman were arrested and placed in the officer's automobile. One of the men who accompanied the sheriff testified that while in the automobile with Burman: "I told Mr. Burman if he didn't fly the red flag he wouldn't go to jail." "He said, 'I have been a citizen here for 20 years, and I know what I am doing.' " Defendant Burman denied having made the statement just above quoted. Further statement of the facts disclosed by this record is not essential at this point to a consideration of the main questions presented for review.

Appellants challenge the constitutionality of the statute under which they were prosecuted and convicted. In this connection it is noted that the statutory provision consists of two paragraphs. The first paragraph defines the offense, while the second creates a presumption of evidence. Appellants' contention is that the enactment is in violation of article 2, §§ 2, 4, 16, 19, of the State Constitution for the following reasons: The statute prohibits or tends to prohibit the right peaceably to assemble and to consult for the common good (§ 2); it interferes with, restrains and abridges liberty of speech (§ 4); it compels one to be a witness against himself and deprives him of life and liberty without due process of law (§ 16); and further the statute is so framed that the accused in a criminal prosecution is deprived of the right to be informed of the nature of the ac-

cusation made against him (§ 19). Appellants further claim the enactment is invalid in that it contravenes the 14th Amendment of the Constitution of the United States wherein it is provided:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

On this phase of the case appellants in their brief urge:

"It will be observed that there appears no limitation whatever in relation to the purpose of the display of the flag and it makes no difference whether the flag is displayed by a debate club, a religious society, a college club or a political unit. Any display of the red flag at any public assembly, parade or demonstration is made an offense. The right to display a flag falls within the constitutional guarantee of free speech, and as such is embraced in the 14th Amendment to the Federal Constitution."

Constitutionality of the statute can only be determined from a proper point of view. The legislative purpose must not be ignored. The thing forbidden by the statute must be considered as a whole; not dissected into a multiplicity of parts and from a finding that no one of such parts constitutes a wrong which may be prohibited, conclude that therefore taken as a whole the course of conduct covered by the statute cannot be made an offense by legislative fiat and that the attempt to do so is violative of constitutional rights. In the statute now under consideration the forbidden display of a red flag is confined to such display "in any public assembly, parade or demonstration." Herein we are concerned

only with its display at a "public assembly." Under this record there can be no question but that there was such a display at a public assembly, and a somewhat persistent effort to renew and continue such display.

In this connection it becomes necessary to consider whether there is justification from the standpoint of public peace and safety for legislation prohibiting the display of a *red* flag. How does it differ, if at all, from a flag of any other color or design? Of what is the *red* flag emblematic, for what does it stand, what does it teach? We hold it to be a matter of common knowledge that the *red* flag when displayed in the manner forbidden by the statute is the emblem, the advocate and teacher of anarchy. This is as much a matter of common knowledge and should be and is as much a matter of which every court can take judicial notice as that the stars and stripes are the emblem of freedom, and wholly inimical to the teaching of anarchists. To this point reference is made to our decision in *People* v. *Burman*, hereinafter quoted. See, also, *Murdock* v. *Clark* (C. C. A.), 53 Fed. (2d) 155.

In general acceptance and properly there is a marked distinction between anarchism and communism, notwithstanding there is authority for saying "anarchism is a variety of communalism." Webster's Dictionary (1925). But it is not of controlling importance in the instant case whether the red flag was displayed as an emblem of anarchism or communism, or of either. Nor is it decisive herein that one may advocate the adoption by peaceable and orderly means of the principles of anarchy or of communism, or of other forms of government notwithstanding the advocated governmental principles may be wholly incompatible with and even abhorrent

to our present form of government. See *Stromberg v. California,* hereinafter cited. Such advocacy is not prohibited by the statute. The sole test here is the right or power of the legislature to prohibit the use of the red flag in the manner specified in the statute. We hold such statutory provision valid because by its use incident to the advocacy of radical changes of government the red flag has become definitely identified with the element in such movements which has advocated and does advocate the use of force in the overthrow of our present form of government. The red flag is not an emblem of peaceful means of accomplishing governmental revolution. Instead, in common acceptance, it is a challenge and a threat of the use of force and the resort to destruction incident to governmental revolution. Because the red flag is the insignia of such doctrines and teachings, its use in the manner forbidden by the statute will cause a breach of public peace and endanger the lives and property of citizens generally. To some degree such was the development in the instant case. Hence the legislature in the exercise of police power may within the limitations of the statute forbid the display of the red flag.

The obvious and well-known result of the display of a red flag incident to a public assembly, parade or demonstration is a matter of record in this court in a decision affirming conviction under an ordinance in consequence of a breach of the peace caused by displaying red flags in a public parade. We quote it in part:

"The question here is not whether the defendants have in general a right to parade with a red flag. It is this: Had they such right, when they knew that the natural and inevitable consequence was to create riot and disorder? Defendants knew this red flag

was hated by those to whom it was displayed, because it was believed to represent sentiments detestable to every lover of our form of government. They knew that it would excite fears and apprehension, and that by displaying it they would provoke violence and disorder. Their right to display a red flag was subordinate to the right of the public. They had no right to display it when the natural and inevitable consequence was to destroy the public peace and tranquility. * * * It is sufficient to say that defendants by their conduct did 'aid, countenance, and assist in making a riot, noise, and disturbance.' " *People* v. *Burman,* 154 Mich. 150, 156 (25 L. R. A. [N. S.] 251).

It must be concluded that there was and is not only justification but an apparent necessity for the enactment of the statutory provision. When such justification or necessity exists then within reason any so-called rights of individuals must yield to the limitation necessarily imposed thereon; and in this requirement there is no invasion of a constitutional right. The enactment of this statute is clearly within the proper exercise of the police power of a sovereign State.

"That attribute of sovereignty known as 'police power,' though difficult of definition, includes the power of legislation deemed essential for protection of the public peace, good order, morals, safety, and health." *Locke* v. *Ionia Circuit Judge,* 184 Mich. 535, 539.

This statute does not interfere with the right of citizens to peaceably assemble and consult relative to the common welfare; nor does it impair freedom of speech, assuming (as appellants assert) "the display of a flag is tantamount to the expression of speech, within the meaning of constitutional provisions."

"The right (of free speech) is not an absolute one, and the State in the exercise of its police power may punish the abuse of this freedom. There is no question but that the State may thus provide for the punishment of those who indulge in utterances which incite to violence and crime and threaten the overthrow of organized government by unlawful means. *There is no constitutional immunity for such conduct abhorrent to our institutions.*" *Stromberg* v. *California,* 283 U. S. 359, 368 (51 Sup. Ct. 532, 73 A. L. R. 1484).

If the activities of defendants and the organization with which they are identified are within the law, no good reason appears why the symbol of such activities should not be something other than the red flag with its inseparable traditions of advocacy of the use of unlawful means for the accomplishment of an end. Because of the fixed symbolical significance of the red flag its display in the manner forbidden is an argument in favor of sedition, sabotage and direct action in political matters; and this is true notwithstanding the avowed purpose of an advocate to the contrary or the assertion that the display of the red flag is not intended to be violative of the law. Hence prohibition of its display in the limited manner provided in the statute does not infringe the right of free speech.

Counsel for appellants review at length and rely upon the *Stromberg Case, supra.* Their brief asserts it to be "the leading case in the country;" and that the statute passed upon in that case was "neither as broad nor as general as the one involved in the case at bar." Reference to the *Stromberg* decision discloses at once that it in no way sustains the contention of appellants herein. Yetta Stromberg was convicted in the State courts of having violated a California statute (section 403-a of the penal

code) which undertook to make it a felony if one displayed a red flag or a flag of any color or design in any public place or at a public assembly (1) as an emblem of opposition to organized government; (2) as a stimulus to anarchistic action; or (3) as an aid to propaganda of a seditious character. In the United States Supreme Court her conviction was set aside and the case remanded for the reason that conviction in the State court was under the general terms of the statute rather than specifically under any one of the three clauses of the statute above noted; and in effect the first of the three clauses was held unconstitutional. Chief Justice Hughes, delivering the prevailing opinion, said:

"The basis of the decision, as more fully stated in the opinion of the two concurring justices (*People v. Mintz,* 106 Cal. App. 725 [290 Pac. 93]), was this: 'The constitutionality of the phrase of this section of opposition to organized government, is questionable. This phrase can be eliminated from the section without materially changing its purposes. The section is complete without it, and with it eliminated it can be upheld as a constitutional enactment by the legislature of the State of California.' Accordingly, disregarding the first clause of the statute, and upholding the other clauses the conviction of the appellant was sustained.

"We are unable to agree with this disposition of the case. The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. * * *

"We have no reason to doubt the validity of the second and third clauses of the statute as construed

by the State court to relate to such incitements to violence.

"The question is thus narrowed to that of validity of the first clause, that is, with respect to the display of the flag 'as a sign, symbol or emblem of opposition to organized government.' * * * Thus it was said (in the opinion of the State court) that the clause (1) 'might be construed to include the peaceful and orderly opposition to a government as organized and controlled by one political party by those of another political party equally high-minded and patriotic, which did not agree with the one in power. It might also be construed to include peaceful and orderly opposition to government by a legal means and within constitutional limitations.' * *. * The first clause of the statute being invalid upon its face, the conviction of the appellant, which so far as the record discloses may have rested upon that clause exclusively, must be set aside."

Consideration of the decision in the *Stromberg Case* discloses that it in no way sustains a contention that in the exercise of its police power a State may not forbid conduct which will result in a breach of the peace, imperil human lives or jeopardize the safety of private property. Instead, the holding of Chief Justice Hughes is directly to the contrary.

Incident to appellants' claim that the statute is unconstitutional in that it compels one to be a witness against himself, deprives him of life and liberty without due process of law, and denies him equal protection of the law, it is urged that the statute creates a presumption of the guilt of an accused; and that it is ambiguous, vague, indefinite, and discriminatory. It is asserted in appellants' brief:

"The effect of the presumption of anarchy created by the statute is to deprive the defendants of their

presumption of innocence and to place the burden of proof upon them in the first instance. Presumption of guilt in such a case is denial of due process."

In support of the above appellants cite our recent decision in *People* v. *Licavoli,* 264 Mich. 643. The distinction in the statutory provision passed upon in the *Licavoli Case* and the statute now under consideration is obvious. The prevailing opinion in the *Licavoli Case* is based upon the fact that the legislature in the act then before the court attempted to make a fact or circumstance which had no logical connection whatever with the offense charged evidence of the guilt of the accused. As stated in that opinion by Mr. Justice WIEST:

"The presumption so declared by the enactment is not a rational deduction or inference from fact to fact, but an arbitrary fiat of the legislature."

This is not true of the statutory provision under which appellants herein were charged and convicted. Here the added clause reads:

"The use of such a flag at any such assembly, parade or demonstration shall be considered as *prima facie* evidence of its use as an emblem of anarchy."

In so providing, the legislature merely embodied in the statute recital of a matter of common knowledge and common acceptance, as we have hereinbefore stated. In this instance that which the legislature decreed should be *prima facie* evidence is confessedly inherent in, and an essential element of, the course of conduct forbidden and made criminal by the statute. It is not "an arbitrary fiat of the legislature." Instead there is a rational connection between the statutory offense and the inference to be drawn therefrom which is made *prima facie* evi-

dence of anarchy. There can be no doubt of the power of the legislature to enact rules of evidence provided such rules do not contravene constitutional rights; and the portion of the statute last above quoted is an appropriate declaration of legislative intent and purpose.

We are unable to agree with appellants that the statute is in any way ambiguous, vague or indefinite, nor is it discriminatory. Incident to this latter phase of the case it is noted in appellants' brief that certain organizations or societies actually use or may use the red flag as their symbol, and that workmen at times use a red flag as a signal of danger. It may well be questioned whether the use of a red flag under any of the circumstances above noted or similar circumstances would fall within the statute, surely the one last suggested does not. But the obvious answer to any and all such supposed uses of the flag is that if the enactment is a valid exercise of the police power, as we hold it is, any person displaying the red flag in violation of the statute must accept the consequences. In so displaying a red flag one is not exercising any inherent or vested right protected by the constitutional provisions. *People* v. *Burman, supra.* It follows from what has already been stated herein that we do not find the act under consideration to be in any way in violation of the provisions of the 14th Amendment to the Federal Constitution above quoted. In short, as against any objection here urged, the statute is constitutional.

We have already referred somewhat to the factual aspect of this case, but have noted only in part the testimony relative to defendants having violated the quoted statute. Consideration of the whole record satisfies us that the people submitted sufficient competent testimony to make the issue of the guilt or

innocence of the defendants a question of fact for the jury.

The trial judge construed this statute as creating an offense of which one could not be convicted except it was established "beyond a reasonable doubt that the red flag was used as an emblem of anarchy." Such construction was erroneous. Instead, as asserted in appellants' brief:

"It is clear from reading the law that the prohibition is general and is not limited by the presumption concerning 'anarchy.' * * * We submit * * * the prohibition against the display of the red flag in a public assembly, parade or demonstration is a general prohibition. * * * This would, therefore, indicate that 'anarchy' was not properly an issue in this case charging the display of the red flag."

The erroneous construction of the statute by the circuit judge led him into holding, against repeated objections of defendants' counsel, that testimony as to communism and anarchy was admissible. On direct examination of one of the people's witnesses the following testimony was given:

"*Q.* Is it a matter of general knowledge with the people at Eben that he (Burman) is leader of the Communist party out there?

"*A.* Yes, sir."

The following is from the direct testimony of another of the people's witnesses:

"The fellow I saw at Marquette two or three days before talking at a Communist meeting was Mr. Immonen."

Still another of the people's witnesses on direct examination testified:

"*Q.* Then you know of your own knowledge, that Mr. Burman was a candidate on the Communistic party ticket for judge of probate?

"*A.* He told me he was the leader of the Communist party, getting up a ticket of his own.   *   *   *

"*Q.* Did he say he was a candidate for judge of probate on the Communist ticket?

"*A.* Yes."

All of the foregoing and other testimony of like character was received over defendants' objections.

This same erroneous construction of the statute resulted in the case being submitted to the jury under a prejudicial charge. We quote in part:

"I further charge you that individuals may violate this statute by words either spoken or written, even though they have committed no act of physical injury or violence. It is the power of words that has the potent force to violate the provisions of *this* statute. It is the dangerous doctrine of anarchy and its supporters that ought to be punished.

"If the evidence in this case convinces you, beyond a reasonable doubt, that the party to which these defendants belong has an avowed hostility to this government and an open antagonism to all political parties which profess to support the same form of government, *then they would be guilty of anarchy according to the statute which I have just read.*"

Clearly the guilt or innocence of each of these defendants turned upon the simple and sole issue of whether he committed the statutory offense; and the statutory offense is the "display (of) a red flag in any public assembly, parade or demonstration in this State." Nothing else. The testimony admitted as a part of the people's direct case just above noted was of such a character as to prejudice the jury against each of the defendants. It and the portion of the charge to the jury above quoted constituted prejudicial error in that the defendants were there-

by deprived of a fair and impartial trial. This necessitates reversal.

Numerous other assignments of error are urged in behalf of appellants. Many of them are without merit and the others are of such a character that they are unlikely to occur on a retrial of this case. We think it sufficient to note that on the record made at this trial the court might well have given certain of defendants' requests to charge which were neither given nor covered. Among these are the following:

"Mere remonstrating with an officer concerning the legality or illegality of his acts does not constitute a crime.

"If you find from the evidence that defendant Burman was merely remonstrating with the officers concerning the legality of their acts that would not make him guilty of the crimes charged.

"Absence of disapproval or opposition by the defendants in connection with the display of the red flag is not itself sufficient to make them guilty."

On this appeal we need not and do not determine the question as to whether failure to give the above requests would alone constitute reversible error; and further, it may be noted that upon a retrial of the case these or similar requests to charge might or might not be proper, depending upon the record made at a subsequent trial.

The conviction of each of these defendants is vacated and a new trial granted.

POTTER, C. J., and NELSON SHARPE, FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.