On exceptions to a master's report in a suit to annul a marriage.
The petition is not based on any of the causes enumerated in the statute, but seeks to invoke the original jurisdiction of the chancellor to annul an unconsummated marriage on the ground of fraud. The parties went through a ceremony of marriage on May 20th, 1922, before a civil officer in the State of New York authorized to perform the same. At that time the petitioner was a woman twenty-two years of age. No children resulted from the marriage, and the master reports that he is convinced that the ceremony was never consummated by marital cohabitation.
The petitioner rests her suit upon false statements made to her by the defendant prior to their marriage as to his financial condition. She says that he told her he was possessed of two automobiles, one of which he would present to *Page 254 
her after their marriage; that he had savings in cash in a bank amounting to over $2,000, and in proof thereof exhibited to her a bank book which, after the marriage, she learned was not his and the deposit was not in his name. He also assured her that he had an important position in a large company for which he was in receipt of wages of $75 per week. All of these statements were untrue.
After the ceremony the parties took dinner in New York, and later he left her for a short time at the home of one of her friends, to which he returned about five o'clock in the evening, where he met her and took her and her mother riding, after which the petitioner returned to her mother's home, and the defendant did not remain there. While the proofs are not entirely clear, it appears that the petitioner and her mother learned of the falsity of the defendant's representations as to his position and wealth two days after the performance of the marriage ceremony.
My difficulty with the petitioner's case is twofold: In the first place, the testimony as to non-consummation is woefully weak. It is true that she has said most emphatically, in reply to questions by the master after examination by counsel, that no sexual intercourse has ever taken place between her and the defendant since the marriage. Standing alone, this is, of course, insufficient proof. Garcin v. Garcin, 62 N.J. Eq. 189. The single corroboration of this statement comes from the lips of the only other witness sworn in the petitioner's behalf, namely, her mother. The latter swears:
"He never stayed at my home. * * * My daughter has never lived away from home since the marriage. I can vouch that she has never lived with him."
This is the entire testimony on the direct examination of this witness by the petitioner's counsel, and the only additional testimony of non-consummation was the following in reply to questions asked by the master. Referring to the day of the ceremony she says:
"She came home about quarter to five on Saturday afternoon and she went out with me on Saturday afternoon, and she was out with me on Saturday night. She was home all *Page 255 
day Sunday, and on Monday she went to work, as usual. She was home Sunday night."
A more flimsy attempt to establish non-access of husband and wife would be difficult to conceive. So long as human nature remains as it is, and always has been, no court should be asked to find that there has been no sexual congress between a man and his wife except upon proof of the most satisfactory and convincing kind. The probabilities against such a fact overwhelm the testimony of the petitioner and her mother. At most, the testimony of the petitioner's mother tends to prove that the parties did not pass the night together and that no sexual intercourse took place at any time while the witness was present. Such meager and inconsequential testimony is insufficient corroboration of so important and startling a fact when given by a witness so interested as this one must have been by reason of her relationship to the petitioner and as shown by the extreme partisan attitude disclosed by the transcript of her testimony.
But even if it was proved beyond peradventure that no consummation had followed the marriage ceremony, a decree should not go for the petitioner, as that is not ground for annulment, but for divorce for desertion after the lapse of two years (Wood v. Wood, 3 N.J. Adr. R. 757), except where denial of sexual intercourse was determined upon prior to marriage and persisted in afterwards. Bolmer v. Edsall, 90 N.J. Eq. 299.
Petitioner relies upon the case of Ysern v. Horter, 91 N.J. Eq. 189,
and a number of others following that, such as Dooley
v. Dooley, 93 N.J. Eq. 22, and Rinaldi v. Rinaldi, 94 N.J. Eq. 14.
The pertinent portion of the Ysern Case upon which she relies may be roughly expressed for the present purpose by saying, that before consummation of marriage a decree of nullity will be allowed for fraud of a less serious nature than is the case after consummation, when the public interest becomes much more aroused and the rights of third parties intervene. In the historical and very illuminating opinion of Vice-Chancellor Stevenson in that case, he has expressed his individual view upon matters that were not necessary for a proper decision *Page 256 
of the case, and has, among other things, said that an unconsummated marriage, infected by fraud of any kind, which would render a contract of any other sort voidable, is voidable at the option of the injured party. That such a statement was merely made arguendo is clearly apparent, and that this was consciously within the mind of the vice-chancellor is apparent from the language almost immediately following, when he dealt with the probability of the adoption of a more accurate definition of the rule in the then future, which he apprehended might be developed as the subject became more and more investigated, following his case of first impression in the State of New Jersey. And then he says:
"However this may be, I do not think that any definition of the principle will be formulated which will not include within its beneficient application the gross and scandalous instance offraud upon a girl eighteen years of age, which is presented in this case." (Italics are mine.) In the Ysern Case a very different character of fraud was present. The defendant, after representing himself as a person of good moral character, took his wife, a school girl, to a hotel, where he commenced drinking heavily, and almost immediately told his wife of his "gross immoralities with women, stating that he had seduced other girls." She, of course, refused to consummate the marriage. In the Dooley Case the defendant, after holding himself out as a captain in the army of the United States, with a license to practice medicine, of honest and good character, and sprung from a famliy of wealth and prominence, turned out, in fact, to be a deserter from the army in which he was an enlisted man, and a fugitive from justice, rendering him, of course, unable to conform to the various essentials of marriage in the event of capture by the authorities. In the Rinaldi Case the court was not dealing with the question involved in the case at bar, but with a petition for divorce on the ground of cruelty, resulting in constructive desertion. In Steerman v. Snow, 94 N.J. Eq. 9,
there was a fraudulent misrepresentation of virility by the husband, when, in *Page 257 
fact, he was hopelessly impotent. This fraud strikes at the very essential of marriage that distinguishes that contract from any other legal and proper relation into which a man and woman may enter. Contrasting these cases of moral turpitude and complete inability upon the part of the man to perform his duty as a husband, with the case sub judice, it is found that this man, dealing with a mature business woman of normal education, experience and intelligence, overstepped the boundary that ordinarily limits the activities of a suitor in the winning of a bride. It is fair to say that, under such circumstances, a man always puts his best foot forward to impress the woman of his choice with his desirability as a mate. It was the duty of this petitioner to have investigated the financial condition of the defendant, and especially if her only purpose in marriage, as she indicates, was the securing of support. Lord Stowell, dealing with a suit for nullity by a husband (and the same rule would apply to a woman), said:
"The law presumes that he uses due caution in a matter in which his happiness for life is so materially involved, and it makes no provision for the relief of a blind credulity, however it may have been produced." Wakefield v. Mackay, cited in 1 Hagg.Con. 394.
If this man had not painted the lily in his courtship, and the woman had not been deceived, disease, accident or other misfortune might have rendered his and the petitioner's position even worse within twenty-four hours of their marriage, when she had taken him to cling to him through any and all the vicissitudes of life. Who can say that common experience would have been reversed if she had been willing to do her part, and that this man would not have settled down to perform the serious duties of a husband when he found himself in the atmosphere created by a dutiful and loving wife?
His fraud did not strike at any of the great essentials of marriage for which that solemn contract should be vitiated. 1Fras. Dom. Rel. 230. *Page 258 
"In that contract of marriage which forms the gateway to the marriage status, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently, a mistake, whether resulting from accident, or, in general, from fraudulent practices in respect to the character, fortune, health or the like, dose not render void what is done. So are all the authorities."
(Citing many.) 1 Bish. Mar. D. § 459. The author, also, is dealing with an unconsummated marriage.
Of course, one may contract a valid marriage solely for the material benefits to be so acquired. But, in that event, all possible avenues of investigation must be explored, and the marriage must be entered upon largely at the risk of him who does so. It has never been the policy of the law to regard marriage as other contracts are regarded. It is true that it is a civil contract as distinguished from the sacramental aspect given to it by the church. But it is a contract with peculiar consequences and effects, to be found in no other, and cannot be tested by the same means as ordinary contracts are. Courts are not designed to assist those, sui juris, who make stupid contracts. If the petitioner married for money (and she certainly did not marry for love) she made a bad bargain. Unfortunately, that in itself is no ground for relief under the circumstances of this case. A sound policy requires a far greater wrong than has been shown, to dissolve a contract so peculiar as that of marriage, whether consummated or not.
The exceptions to the master's report should be overruled. *Page 259