## UNITED STATES v. HAUTAU.

### No. 396c.

District Court, D. New Jersey.

Feb. 20, 1942.

Charles M. Phillips, U. S. Atty., and Thorn Lord, Asst. U. S. Atty., both of Trenton, N. J., for the United States.

Solomon Golat, of Newark, N. J., for defendant William Hautau.

FAKE, District Judge.

The issues here arise on demurrer to an indictment against one William Hautau. The substance of the indictment reads as follows: "That on or about the 12th day of July in the year 1940, at the City of Newark, in the County of Essex and State and District of New Jersey and within the jurisdiction of this Court, one William Hautau, being then and there a person employed under the Work Projects Administration, an agency of the United States, unlawfully and feloniously did knowingly and willfully make and use and cause to be used a certain false affidavit for filing in the records of the said Work Projects Administration and by law to be made by the said William Hautau on official Form 608, he, the said William Hautau, then and there well knowing the said affidavit to contain the fraudulent and fictitious statement and entry that he, the said William Hautau, was not a Communist, whereas in truth and in fact, as the said William Hautau then and there well knew, he, the said William Hautau, was a Communist; the making and using of the said affidavit being a matter within the jurisdiction of the said Work Projects Administration, as such agency of the United States; contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States."

There is confusion in the briefs as to whether this indictment is founded on the W. P. A. Act (Title 15 U.S. C.A. §§ 721–728) § 15(f) or upon the Act relating to the presentation of false

claims (Title 18 U.S.C.A. § 80) or upon both. Without considering the fact that the cover of the indictment indicates that it is founded upon Title 18 U.S.C.A. § 80, there is sufficient on the face of the indictment to indicate that it is founded on that section. However, should there be any doubt about it, the evil is one easily overcome by a bill of particulars. Having arrived at this conclusion, all issues raised as to the validity of the W. P. A. Act, which is merely incidental here, must be disregarded. In United States v. Kapp, 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205, it was held that those who attempt to obtain payments from the Government by false representations are estopped to defend upon the ground that the statute providing for such payments has been declared unconstitutional, and again in Kay v. United States, 303 U.S. 1, at page 6, 58 S.Ct. 468, 82 L.Ed. 607, the same result is reached as to a statute not therefore voided and on which an attempt was made to question its validity. It was a failure to consider the law as it is found in these two cases which caused the confusion above mentioned.

■ This, however, does not obviate the necessity of passing on the sufficiency of the use of the word Communist as it appears in the indictment, and in entering upon this consideration it must be emphasized that the W. P. A. statute is not in issue, and the allegations as to the requirements of the W. P. A. Act are for present purposes mere surplusage.

It is obvious that before we are able to deal with the question as to the truth or falsity of the allegation relating to the affidavit, there must be a degree of certainty as to what the word Communist connotes. In the absence of such certainty, the defendant is not advised as to the nature of the charge which he is called upon to answer, and the indictment must fall because of its vagueness and consequent repugnance to the Fifth Amendment.

A New Jersey statute provides that "Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other state, is declared to be a gangster; * * *." Laws 1934, c. 155, § 4, N.J.S.A. 2:136–4. After a con-

viction under this statute, and affirmances by the Supreme Court, State v. Pius, 118 N.J.L. 212, 192 A. 89, and the Court of Errors and Appeals of the State, 120 N.J.L. 189, 198 A. 837, the case reached the United States Supreme Court on the issue of vagueness in the statute and repugnance to the due process clause of the Fourteenth Amendment; Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 619, 83 L.Ed. 888. In the opinion, Mr. Justice Butler quotes from Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law", and after analyzing the language of the statute he concludes as follows: "The challenged provision condemns no act or omission; the terms it employs to indicate what it purports to denounce are so vague, indefinite and uncertain that it must be condemned as repugnant to the due process clause of the Fourteenth Amendment."

In State v. Klapprott, 127 N.J.L. 395, 22 A.2d 877, the Supreme Court of New Jersey had before it a New Jersey criminal statute in which the terms "hatred", "abuse" and "hostility" were employed. The statute made it a misdemeanor to utter any statement inciting, promoting or advocating hatred, abuse, violence or hostility against any group residing in the State by reason of race, color, religion or manner of worship. N.J.S.A. 2:157B–5. Mr. Chief Justice Brogan, speaking for the court, held the words above quoted to be vague and indefinite, ruling that the demurrer, which had been directed to the indictments, should have been sustained.

Straying outside the briefs and into the field of Semantics, it is interesting and pertinent to note what Chase says in his book on the Tyranny of Words at pages 10 and 11: "Let me ask you a question:", he writes, "Does communism threaten the world? Unless you are conscious of the dangers lying in the use of

abstract terms, you may take this question seriously. You may personify 'communism' as a real thing, advancing physically over the several continents, as a kind of beast or angel, depending on your politics. You give a careful, weighted answer or else an excited, passionate answer, to my question. But you have identified the word with the thing, and furthermore you would be very hard put to it to find lower-order referents for the term. I have been searching for them for years. The question as it stands is without meaning. I might about as well ask you: Does omniscience threaten the world? or Does Buzzism threaten the world? If we can agree—if sane men generally can agree—on a series of things in the real world that may properly be summarized by the label 'communism,' then the question has meaning, and we can proceed intelligently to its discussion. Otherwise not. Can you and I and Jones and Finkelstein come to an agreement about what is meant by 'communism'? Try it sometime with Jones and Finkelstein. * * * Yet until agreement is reached, the question can liberate plenty of emotion but little real meaning. Jones will follow his meaning and Finkelstein his, and be damned to you."

While the cases above cited deal with statutory construction and the inquiry here is directed to the use of a word in an indictment, the study in each instance is directed to the same objective; the ascertainment of reasonable certainty of meaning.

Resort to dictionary definitions is unsatisfactory, in that none of them cure the vagueness we are endeavoring to avoid. Thus, we find in Webster's New International Dictionary, Second Edition, the following: "Communism," * * * "1. A system of social organization in which goods are held in common;—the opposite of the system of private property. 2. —Communalism, 1. 3. Any theory or system of social organization involving common ownership of the agents of production, and some approach to equal distribution of the products of industry. The popular use of the word Communism conforms to the third of these definitions. The scientific usage sometimes conforms to the first alone, and sometimes alternates between the first and second. Most modern writers use the term indiscriminately in these two meanings." "Communist,"

* * * "One who believes in communism in any of the first three senses named, or attempts to put its principles into practice." The foregoing can lead to nothing but confusion in so far as the instant case is concerned. Quoting from the New Standard Unabridged Dictionary, Funk and Wagnalls, 1941, we find: "Communism," * * * "1. A social system in which there is community of goods. 2. A theory of government and social order according to which property and the instruments of production are held as a common trust and the profits arising from all labor devoted to the general good: in rare cases involving the abolition of the family, as formerly exemplified in the practice of the Wallingford and Oneida communities in the United States. Says Palgrave * * * 'Communism is the theory which teaches that the labor and the income of society should be distributed equally among all its members by some constituted authority.' W.D.P. Bliss in Encyc. of Social Reform p. 262 (F. & W. '08.) 3. A doctrine or practise calling for the complete abolition of all private property of every description, and the absolute control by the community in all matters pertaining to labor, religion, social relations, etc.: a phase of extreme socialism shading into anarchy, exemplified in France after the overthrow of Napoleon III in 1870." "Communist," * * * "1. One who advocates or practises communism. 2. One who supported the Commune of Paris in 1871; a communard. 3. One who advocates communalism or government by communes. 'The one thing that is shared by all communists, whether speculative or practical, is deep dissatisfaction with the economic conditions by which they are surrounded." Encyc. Brit. 11th Ed., vol. vi p. 791. Here again we have no fixed limitations of inclusion or exclusion. See also Encyclopedia Americana, Vol. 7, page 417, wherein the subject is dealt with generally and in detail under divers sub-headings ending with a bibliography.

Looking to some of the cases in which the word Communist or Communism is involved, we find in People v. Immonen, 271 Mich. 384, 261 N.W. 59, as reported in 8 Words and Phrases, Perm.Ed., p. 149, the following: "Communism. There is a marked distinction between 'anarchy' and 'communism,' notwithstanding there is authority for saying anarchy is a variety of communism." "Communist Party. The

Communist party is an organization which entertains a belief in the overthrow by force or violence of the government of the United States, and membership in that party by an alien at the time of his entry is ground for his deportation." Ungar v. Seaman, 8 Cir., 4 F.2d 80, 81.

In United States v. Tapolcsanyi, 3 Cir., 40 F.2d 255, 257, the naturalization law was involved, and the issue turned on the question as to whether the defendant had sworn falsely on naturalization, having avowed that he was attached to the principles of the Constitution of the United States, when it appeared that before he attained citizenship he had sworn, among other things, that he did not believe in the Government of the United States and was opposed to organized government, and after naturalization had written a letter in which he said he was, and for eight years prior had been a red communist, and praised the III Communist International. The lower court canceled the naturalization, D.C., 32 F.2d 385, and in affirming, Judge Woolley said at the Circuit: "While every tolerably informed person knows what a Communist is, we are not informed precisely what is a 'red' Communist, yet the adjective 'red' qualifying the word 'Communist' seemingly suggests a superlative. From this description of himself, it is fair to conclude that the respondent was an extreme Communist, one without qualifications or reservations." From the foregoing it would appear that among those who refer to themselves as Communists there are different shades of belief. It is to be regretted that the judge did not enlarge upon the understanding of tolerably informed persons, since without further clarification we are left without a definition.

The time honored rule of construction as announced by the courts from an early day, is that words are to be given their usual and generally accepted meaning. In endeavoring to ascertain whether there is now any unity of thought bearing on the word Communist, I have made inquiries of men of reasonable intelligence. I asked whether those who believe in and advocate government ownership of irrigation projects and government dams erected for the sale of water power by the government could reasonably be classified as Communists. In some instances the answer was No, in others, Yes, and in others, Yes, they are Communistic to the extent that they believe in such ownership and operation, but not to the extent that they might be classified as all out Communists. It is my own view that the word has that vagueness and uncertainty in it which Chase expounds in his book, and that the minds of men do not meet in a general acceptation of its import. Therefore, the defendant in this indictment is found in a position of doubt as to what the charge against him is and can not be called on to defend himself. Moreover, the Court also finds itself in a position where it can not give a reasonably certain inclusive and exclusive definition of the word. The demurrer to the indictment is, therefore, sustained. Let an order be entered in conformity herewith.