Arthur L. Amsden, Plaintiff, *v.* Beatrice Amsden, Defendant.

Supreme Court, Monroe County, February 25, 1952.

*William L. Clay* and *Kermit E. Rice* for plaintiff.

*Alan M. Hill* for defendant.

FRED D. CRIBB, Official Referee.   This action having been reached for trial at an equity term of the Supreme Court the defendant withdrew her answer, in which she had counter-claimed for divorce, and the presiding Justice referred the case to me as Official Referee to hear, try and determine.   At the trial defendant was represented by counsel who stated that she was not opposing the relief sought by plaintiff but was interested only in any provision the court might make for the support of the child.

The plaintiff has instituted this action against the defendant seeking an annulment of their marriage which was solemnized before a Justice of the Peace on or about September 3, 1947. The defendant was three months pregnant at the time of the marriage.   They never lived together or cohabited after the marriage.   The plaintiff continued to live with his mother, and the defendant with her sister in another town.   In August, 1947, some two or three weeks before the marriage, plaintiff and defendant had several talks at the home of defendant's sister who participated in the conversations.   The defendant insisted that plaintiff marry her " for the sake of giving the child a name ".   Although not denying his responsibility for defend-ant's pregnancy the plaintiff was reluctant to accede to the marriage.   Finally they entered into an agreement best described by his testimony on the witness stand, all of which was corroborated by defendant's sister.   When asked to give the conversation he stated:  " Well, we were forced into marry-ing and she said if I married her she would give me a divorce or an annulment.   The reason for the marriage was to give the child a name, that's all.   We didn't plan to live together or anything else.   In other words, it was not intended to be a permanent affair.   She said she would give it to me, and we

went on quite awhile, and then she didn't hold up her end, so I had to start suit ". Corroborating this, defendant's sister further testified that defendant said to plaintiff: " If you marry me, I will give you your freedom as soon as the child is born or shortly thereafter ", and that plaintiff replied: " I will marry you just to give the baby a name, but we will have no marriage; we will never live together or anything ". In the following month plaintiff and defendant were married. He immediately returned to his home with his mother, and she to her home with her sister. The marriage was never consummated by the exercise of any of the rights, duties and obligations inherent in the marital relationship. The child was born in March, 1948, and thereafter defendant failed to take any action to obtain a decree of divorce or annulment, and finally this action was commenced by the plaintiff.

The foregoing facts were definitely and satisfactorily established upon the trial. Plaintiff's case is based on the alleged fraud of the defendant in promising him his freedom after the birth of the child and her failure to take the action as promised. That plaintiff relied upon this promise and would not have married the defendant had he known that she would fail to give him his freedom is clearly shown by the evidence.

I reserved decision at the conclusion of the trial because of these most unusual facts and circumstances attending the agreement to marry and the subsequent formal ceremony of marriage — all presenting possible questions of public policy, and the coming into court with unclean hands on the part of the plaintiff who had been a party to a marriage contract contravening nearly every legal concept of the marital status long established and recognized by our courts. Neither plaintiff's brief nor my independent search has revealed any case involving facts as here presented. However, as stated by the court in *Morris* v. *Morris* (138 Misc. 682, 686): " The absence of precedents, or novelty in incident, presents no obstacle to the exercise of the jurisdiction of a court of equity. It is the distinguishing feature of equity jurisprudence that it will apply settled rules to unusual conditions and mold its decrees so as to do equity between the parties." The present case involves facts which are novel in many respects, but even so it is properly before the court for consideration and determination.

There is nothing in the record of the instant case to support the conclusion that a valid, legal and binding marriage took place. Although a legal ceremony was performed, it is clear that neither party intended or considered it to be a valid and

legal marriage. On the contrary, it affirmatively appears that the sole object of the marriage ceremony was to give a name to the child to be born. The law considers marriage in the light of a civil contract as to its inception. As in other contracts, consent is a necessary element to the validity of a marriage contract, and the minds of the parties must unite in such common intention. " Mere words, without the intention corresponding therewith will not make a marriage or any other civil contract, but the words and acts are evidence of such intention, and it must be shown clearly therefrom that both parties intended that they were not to have effect." (*Dorgeloh* v. *Murtha,* 92 Misc. 279, 286. See *Maher* v. *Maher,* 172 Misc. 276, and *Thurber* v. *Thurber,* 186 Misc. 1022.)

While a marriage under the circumstances here disclosed clearly offends the sanctity and recognized purpose of the marital relationship, it is nevertheless subject to judicial determination. Has such a marriage ripened into complications of a public status involving consideration of questions of public policy? I do not so believe, and am convinced that no valid marriage ever was intended by the parties to the instant case. It was only an arrangement ignorantly devised for the single purpose, as they planned it, of making sure that their child would not be born out of wedlock. Our courts in granting annulments appear to have adopted a different rule as to marriages never fully consummated and those which have attained a public status. (*Lewine* v. *Lewine,* 170 Misc. 120; *Griffin* v. *Griffin,* 122 Misc. 837, affd. 209 App. Div. 883.) In *Svenson* v. *Svenson* (178 N. Y. 54, 57) the court quoted with approval from section 600 of Nelson on Marriage and Divorce as follows: " ' Marriage begins by contract and results in a *status.* If before children are begotten, before debts are created, real estate involved, and the community have long recognized the relation, the injured party seeks relief from fraud, error or duress, it seems clear that no consideration of public policy will prevent a court from annuling a marriage where the relation has not fully ripened into the complications of a public *status.* In such case the marriage is but little more than a contract; and, in view of the serious consequences to follow, the degree of fraud which vitiates a contract should be sufficient.' " At page 58 the court further said: " This principle was very clearly and concisely stated by WOODWARD, J., in *di Lorenzo* v. *di Lorenzo* (71 App. Div. 509, 519) as follows: ' When, however, the fraud is discovered before the marriage is consummated, and the

innocent party refuses to cohabit, the marriage is so inchoate and incomplete that the *status* of the parties is similar to that of parties to an executory contract, and may be annulled without violating any considerations of public policy.' ''

The parties to this action are young and were ignorant of the law as to marriages. I am convinced by the evidence that they honestly believed the performance of the wedding ceremony would not under the circumstances constitute a valid and binding marriage; that they were innocent of the legal complications involved in the kind of marriage they proposed and believed it could readily be dissolved; that they had no knowledge of the public status and public policy rules as established by our courts, and that neither party at the time was seeking to practice any fraud or deception on the other. Neither do I feel there was any collusion on their part to perpetrate any fraud on the court. While the privately agreed terms of this marriage contract are to be condemned, the purpose of the parties in marrying was worthy — to protect their expected child from the ignominy of illegitimacy. Following the marriage ceremony they never cohabited, never even occupied the same house, and never exercised any of the rights, duties or obligations incident to the marital relationship. In my opinion there is no possibility that they ever will establish a home and live together as husband and wife. If the plaintiff is to be denied the relief here sought and the marriage found valid, it will exist in name only and serve no good purpose, while the parties will be prevented from marrying again and possibly establishing homes where true love and happiness may prevail. On the other hand, the annulment of the marriage, in addition to relieving the parties of any marital obligations, may serve to obliterate in some degree the memories of the unfortunate circumstances surrounding their first venture in matrimony.

For the reasons stated, and under the broad powers accorded courts of equity, I conclude that the marriage in question should be annulled. The plaintiff will pay to the defendant $12.50 per week for the support of the child who will remain in the custody of the defendant.

Findings and proposed judgment may be submitted accordingly.