The UNITED STATES of America,
Appellee,

v.

Jose DIOGO, Domingo Das Canas Costa
and Manuel Vilanova Gonzalez,
Defendants-Appellants.

No. 282, Docket 27853.

United States Court of Appeals
Second Circuit.

Argued March 8, 1963.

Decided June 28, 1963.

**900**

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York (John W. Mills, Andrew T. McEvoy, Jr., Asst. U. S. Attys., of counsel), for appellee.

Bertrand D. Gerber, New York City (Murray A. Gordon, New York City, of counsel), for appellants Diogo and Costa.

Harry Wallach, New York City (Lee C. Swartz, Harrisburg, Pa., of counsel), for appellant Gonzalez.

Before CLARK, WATERMAN and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge.

Appellants Jose Diogo, Manuel Gonzalez and Domingo Costa, are alleged to have entered into sham marriages with American citizens in order to obtain nonquota immigrant status under 8 U.S.C. § 1101(a) (27) (A). After a trial upon a twelve count indictment in the district court below, each of the aliens was convicted of (1) falsely representing to the Immigration authorities, in violation of 18 U.S.C. §§ 1001 and 1546, that he was actually married, and (2) entering into a conspiracy with the alleged instigator of the scheme, Adria Gonzalez,[1] and others, to commit the substantive offenses charged. 18 U.S.C. § 371.

Appellants attack the convictions on the grounds, *inter alia*, that the evidence failed, as a matter of law, to prove the offenses charged, and that the trial judge erred in his instructions to the jury. We hold that the convictions must be reversed and the indictment dismissed as to each appellant.

Considering only the evidence most favorable to the Government's contentions, a jury might have found the following facts: In 1951, Jose Diogo, a Portuguese citizen, entered the United States as a business visitor under a temporary permit. In March 1957, he was introduced by Adria Gonzalez, an American of Puerto Rican descent, to Clara Heredia, also an American citizen. At that time Diogo, inasmuch as he had exceeded the time allotted for his stay in this country, was about to be deported. Adria asked Clara Heredia if she would be willing to marry Diogo so that he could remain in the United States. Clara agreed, upon the assurance that she would receive a sum of money and that no sexual relations would be involved.

Pursuant to this understanding, Diogo and Clara were "married" at Newark, New Jersey, on April 6, 1957. Shortly after the ceremony Diogo gave Adria $500 which she shared with Clara. Thereafter, Diogo did not live with Clara

---

1. Adria Gonzalez was tried and convicted below on four counts of conspiracy. She has not appealed her conviction.

and they did not consummate the marriage. On the basis of his representations regarding his change in marital status, the deportation proceedings against Diogo were reopened and he was ultimately found to qualify for nonquota status as the spouse of an American citizen. On January 4, 1958, Clara obtained a Mexican divorce from Diogo.

On February 9, 1960, Manuel Gonzalez, a Spanish citizen, entered the United States under a temporary permit. Shortly thereafter, Adria Gonzalez (who was not related to Manuel) again arranged for a "marriage" to permit the alien to remain in the United States. Yvette Garces, the daughter of Clara Heredia, agreed to marry Manuel for this purpose, upon the understanding that she would be paid for her cooperation and that she and Manuel would not live together as man and wife. Their marriage ceremony took place in Queens, New York, on February 24, 1960. Thereafter, Yvette received $500 from Manuel, but the couple neither lived together nor consummated their marriage. On April 28, 1960, Gonzalez applied to become a permanent resident by virtue of his marriage to an American citizen and his application was granted. Yvette obtained an Alabama divorce in August of 1961.

Appellant Domingo Costa is a Portuguese citizen and the brother of Jose Diogo. On November 9, 1956, Costa was deported from the United States for having overstayed a limited permit to enter this country while he was purportedly in transit to Venezuela. In the summer of 1957, Adria Gonzalez contacted Emma Mercado, an American citizen, and, according to Emma, "asked me if I would like to take a trip to Europe (where) I will meet some young man and that we may get married and that the future will be more rosy for me, that I wouldn't have to work any more." It is conceded by the Government that Emma subsequently agreed in all good faith to marry Costa. No money was mentioned or paid in consideration for the marriage and there never was any suggestion that the marriage would not be consummated or that it would be entered into in contemplation of a divorce. In the latter part of 1957 Emma went to Lisbon, Portugal, where she met Costa and where she remained for some two months while her visa and passport documents were being processed. The couple were married in Lisbon on January 21, 1958, and the marriage was consummated by sexual intercourse. Shortly thereafter Emma returned to the United States; Costa, having received a non-quota immigrant visa as Emma's spouse, entered this country on August 15, 1958. On May 10, 1960, Costa was granted a divorce from Emma in the New York courts.

Upon these facts we have no doubt that appellants may be deportable from the United States under 8 U.S.C. §§ 1251(a) (1) or 1251(c).[2] This, however, was a criminal prosecution, not a deportation proceeding.

We turn, therefore, to the question whether the Government has failed, as a matter of law, to prove violations of

---

2. Under 8 U.S.C. § 1251(c) an alien is deportable if

"(1) hereafter he or she obtains any entry into the United States with an immigrant visa or other documentation procured on the basis of a marriage entered into less than two years prior to such entry of the alien and which, within two years subsequent to an entry of the alien into the United States shall be judicially annulled or terminated, unless such alien shall establish to the satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws; or (2) it appears to the satisfaction of the Attorney General that he or she has failed or refused to fulfill his or her marital agreement which in the opinion of the Attorney General was hereafter made for the purpose of procuring his or her entry as an immigrant."

8 U.S.C. § 1251(a) provides that an alien is deportable if he

"(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry;"

Under 8 U.S.C. § 1182(a) (21), each appellant was excludable from the United States at the time of his entry if he was not, in fact, "the spouse of a citizen of

the criminal provisions under which appellants stand convicted: 18 U.S.C. § 1001 (false statements generally), 18 U.S.C. § 1546 (false statement in application for visa, etc.), and 18 U.S.C. § 371 (conspiracy to commit offense or to defraud United States). The statutory pattern reveals that acts sufficient to constitute violation of the relevant clause of 18 U.S.C. § 1546 [3] will also constitute a violation of 18 U.S.C. § 1001. Moreover, there is no suggestion in the indictment that the alleged conspiracies failed to achieve their supposed objective, the commission of the substantive offenses charged. It is clear, therefore, that the counts in the indictment charging violations of 18 U.S.C. § 1001 constitute the cornerstone of these prosecutions. If, as appellants contend, the Government has failed to prove violations of this provision, their convictions on all counts of the indictment must fall.

■■ Section 1001 of Title 18 U.S.C., provides:

"§ 1001. Statements or entries generally

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representa-

tions, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

It is well established that this section encompasses within its proscription two distinct offenses, concealment of a material fact and false representations. United States v. Uram, 148 F.2d 187, 190 (2 Cir.1945); United States v. Kenny, 236 F.2d 128 (3 Cir.1956), cert. denied, 352 U.S. 894, 77 S.Ct. 133, 1 L.Ed.2d 87; United States v. Lange, 128 F.Supp. 797 (S.D.N.Y.1955). The objective of both offenses may be the same, to create or foster on the part of a Government agency a misapprehension of the true state of affairs. Cf. Lutwak v. United States, 344 U.S. 604, 611–612, 73 S.Ct. 481, 97 L.Ed. 593 (1953). What must be proved to establish each offense, however, differs significantly. False representations, like common law perjury, require proof of actual falsity; concealment requires proof of wilful nondisclosure by means of a "trick, scheme or device."

It is conceded by the Government that the basic substantive offense with which the present indictment charges each of the appellants is that of making false representations with respect to his marital status.[4] The jury was so instructed

---

the United States," within the proper interpretation of that phrase under the immigration law. See note 9, infra.

3. "Whoever knowingly makes under oath any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement—
"Shall be fined * * * or imprisoned not more than five years, or both."

4. Counts 2, 3 and 4 of the indictment charge Jose Diogo with false statements concerning his residence with Clara Heredia, as well as false statements concerning his marriage to her. The Govern-

ment's evidence with respect to the falsity of the representations of residence is at best equivocal. It is established that Diogo spent some time in Clara's apartment and that he kept his clothes there. Clara denied at trial that he had ever spent the night in her apartment, although in prior sworn testimony before the Immigration Service she had stated that Diogo "had resided in her house for one or two weeks" after their marriage.

Count 4 of the indictment charges Diogo with falsely representing that he had known Clara "for about two years" prior to marrying her. Again, the evidence is conflicting. Moreover, there is no suggestion that the period of Diogo's and Clara's acquaintance prior to their marriage ceremony could be material to the issue of his immigrant status if his

below. We are brought, thus, to the question whether the Government has established that the statements of each appellant regarding his marital status were false, and that these statements were known by the appellants to be false at the time they were made.

Appellants maintain that neither the secret reservations of Costa, nor the limited purpose for which Diogo and Gonzalez married their respective spouses, renders these marriages invalid under the domestic relations law of New York or of most other American jurisdictions. See N.Y. Domestic Relations Law, §§ 6, 7; Barker v. Barker, 88 Misc. 300, 151 N.Y.S. 811 (Sup.Ct.1914); Gregg v. Gregg, 133 Misc. 109, 231 N.Y.S. 221 (Sup.Ct.1928); Delfino v. Delfino, 35 N.Y.S.2d 693 (Sup.Ct.1942); Erickson v. Erickson, 48 N.Y.S.2d 588 (Sup.Ct. 1944); Schibi v. Schibi, 136 Conn. 196, 69 A.2d 831, 14 A.L.R.2d 620 (1949); Hanson v. Hanson, 287 Mass. 154, 191 N. E. 673, 93 A.L.R. 701 (1934); Campbell v. Moore, 189 S.C. 497, 1 S.E.2d 784 (1939); DeVries v. DeVries, 195 Ill.App. 4 (1915); 14 A.L.R.2d 624; Note 20 U. Chi.L.Rev. 710 (1953).

The Government does not deny the "formal" validity of appellants' marriages. Relying upon Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L. Ed. 593 (1953) and United States v. Rubenstein, 151 F.2d 915 (2 Cir.1945), cert. denied, 326 U.S. 766, 66 S.Ct. 168, 90 L. Ed. 462, however, the Government contends that the validity of the marriages under state law is immaterial to these prosecutions. The Government argues that, for the purposes of a criminal prosecution such as this one, if two persons, as part of an effort to circumvent the immigration laws, agree to a marriage "only for the sake of representing it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive," they were never married at all. Lutwak v. United States, 344 U.S. at 610–611, 73 S.Ct. at 485–486; United States v. Rubenstein, 151 F.2d at 918–919.

■ Even by the strict standards of validity which the Government would have us adopt as determinative of this criminal prosecution, the marriage of Domingo Costa and Emma Mercado was valid at the time Costa represented to the immigration authorities that he was the spouse of an American citizen. Far from having entered into the marriage "with the understanding that they will put an end to it as soon as it has served its purpose to deceive," Emma married Costa in all good faith and with no knowledge of his ulterior motives. Therefore, there having been no false representation, Costa's conviction must be reversed and the indictment dismissed as to him.

By applying the same strict standards of marriage validity, the Government also contends that the convictions of Diogo and Gonzalez must be affirmed. Whether Rubenstein and Lutwak are dispositive of the issues presented by these appeals, however, raises difficult questions of interpretation.

In United States v. Rubenstein, supra, appellant, a New York attorney, was alleged to have arranged a sham marriage between an alien and an American citizen for purposes of evading the immigration laws. The indictment upon which he was convicted closely paralleled that in the case at bar, save that there concealment of a material fact, as well as affirmative false representations, was charged to have been an objective of the conspiratorial scheme. On appeal Rubenstein claimed that the allegedly sham marriage

marital representations were, themselves, true.

Count 6 of the indictment charges Domingo Costa with falsely representing that the "place to which he was destined in the United States" was Emma Mercado's home in New York City, as well as that he was married to Emma. The weight of the evidence offered by the Government's own witness clearly establishes that both Costa and Emma took up residence in the home of Adria Gonzalez shortly after Costa's arrival in this country. Whether the couple shared the same quarters in the Gonzalez home remains in dispute.

was valid under state law and that the representations with respect to it were true. This court rested an affirmance of Rubenstein's conviction upon two grounds: (1) that the validity of the marriage was immaterial to the charge of concealment of material facts, but (2) that the marriage was, in fact, a nullity under traditional requirements of mutual consent in the law of contract.[5]

In United States v. Lutwak, 195 F.2d 748 (7 Cir.1952) the same problem was presented. The indictment again charged both a concealment and affirmative false representations concerning allegedly sham marriages. Defendants again argued on appeal that their limited purpose marriages were valid. Affirming the conviction, the Seventh Circuit did not deny the materiality of defendants' claims, but held, on the authority of Rubenstein, that the marriages were void for all purposes. 195 F.2d at 753–754, on petition for rehearing 761–762.

The ground upon which the Supreme Court affirmed the judgment of the Seventh Circuit, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, is not entirely clear. A fair reading of Justice Minton's opinion, however, reveals, we believe, that the defendants' concealment of their agreements to separate was the ground relied upon and that the Court was of the belief that it was immaterial whether the marriages were valid.

"Petitioners contended [at trial] that, regardless of the intentions of the parties at the time of the ceremonies, the fact that the ceremonies were performed was sufficient to establish the validity of the marriages, at least until the Government proved their invalidity under French law.

\*    \*    \*    \*    \*    \*

"*We do not believe that the validity of the marriages is material.* No one is being prosecuted for an offense against the marital relation. We consider the marriage ceremonies only as a part of the conspiracy to defraud the United States and to commit offenses against the United States. In the circumstances of this case, the ceremonies were only a step in the fraudulent scheme and actions taken by the parties to the conspiracy. By directing in the War Brides Act that 'alien spouses' of citizen war veterans should be admitted into this country, Congress intended to make it possible for veterans who had married aliens to have their families join them in this country without the long delay involved in qualifying under the proper immigration quota. Congress did not intend to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship; that petitioners so believed is evidenced by their care in concealing from the immigration authorities that the ostensible husbands and wives were to separate immediately after their entry into this country and were never to live together as husband and wife. The common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien *spouses*' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations. Such was not the case here, or so the jury might reasonably have found. *Thus, when one of the aliens stated that he was*

5. In addition to contract cases not involving the marital relationship, the court relied upon McClurg v. Terry, 21 N.J. Eq. 225 (1870) where it was held that a decree would be granted annulling a marriage ceremony entered into in jest as a result of a dare during a joy ride, and where the parties never cohabited. For

the distinction between marriages entered into in jest, and "sham" or "limited purposes" marriages, and for a summary of the differing treatment by the courts of each, see generally, Note, 20 U. Chic.L.Rev. 710 (1953); 14 A.L.R.2d 624.

*married, and omitted to explain the true nature of his marital relationship,* his statement did, and was intended to, carry with it implications of a state of facts which were not in fact true." 344 U.S. at 610–612, 73 S.Ct. at 485–486. (Emphasis supplied.)

We do not read the quoted passage to suggest that a prosecution for *false representations* can be grounded upon the omission of an explanation, which omission only carries with it *"implications* of a state of facts which were not * * * true." To so hold would distort the language of the statute and assimilate the separate offense of concealment into the different one of false representations solely because of a similarity of prohibited objectives.

Nor do we understand the Supreme Court to have established a federal standard of marriage validity by which state-created marriage relationships are to be reviewed and reassessed in the federal courts. Of course Congress may adopt a federal standard of *bona fides* for the limited purpose of denying immigration priorities to persons whose marriages do not meet that standard. That standard, embodied in the Congressional understanding of the terms "marriage" or "spouse" as those terms appear in the immigration statutes is, of course, the relevant standard to apply in exclusion or deportation proceedings brought under the statutory provisions appropriate to those proceedings. What Congress meant by the term "marriage" is also relevant, as indicated in Lutwak, to the determination, for purposes of a concealment prosecution, whether an immigrant has concealed from the immigration authorities a *material* fact about his marital status. If, as the Supreme Court has indicated, Congress intended to grant immigration priorities only to persons whose marriages conformed to the common understanding of that relationship, any deviation from the "normal" pattern of the relationship is a material fact in an application for such a priority. Nev-

ertheless, so long as falsity is an element of a criminal prosecution for false representations with respect to one's marital status, we hold that the validity of the marriage will be material to such a prosecution. We return, thus, to the question whether the representations of marriage made by Diogo and Gonzalez were literally false and were known by appellants to be false at the time they were made to the immigration authorities.

It is undeniable, we believe, that neither of these questions may be answered until the *meaning* of the statements in issue has been ascertained. When he claimed to be the "spouse of" or to be "married to" an American citizen, each appellant purported to state the legal significance of a fact situation. Each representation was rendered ambiguous, however, by the quite understandable failure of appellants to specify the jurisdiction to which their legal conclusions referred. Assuming that New York domestic relations law is as appellants claim it to be, the mere addition of a parenthetical qualification—"under New York law"—would clearly have rendered blameless appellants' marital representations to the immigration authorities. By the same token, the statement that they were married "in the customary sense of the term as intended by Congress" would have rendered appellants culpable, assuming that they were apprised of the proper interpretation of Congressional intent. Therefore, the problem of ascertaining the law under which the validity of appellants' marriage is to be determined in a federal prosecution for false representations, is not, in the first instance, an issue of either federal intramural or federal conflict of laws doctrine. It is a question, rather, of the proper interpretation of appellants' statements.

In construing these statements it is well established that we must look to the meaning intended by the appellants themselves, rather than to the interpretation of the statements which the immigration authorities *did in fact*

*make,* or even to the interpretation which the authorities *might reasonably have made.* United States v. Lattimore, 127 F.Supp. 405 (D.C.D.C.1955), aff'd per curiam by an equally divided court, 98 U.S.App.D.C. 77, 232 F.2d 334 (D.C.Cir.); Seymour v. United States, 77 F.2d 577, 582–584, 99 A.L.R. 880 (8 Cir.1935); United States v. Lattimore, 94 U.S.App. D.C. 268, 215 F.2d 847, 957–959 (D.C.Cir. 1954) (concurring opinion); cf. United States v. Slutzky, 79 F.2d 504 (3 Cir. 1935); United States v. Hautau, 43 F. Supp. 507 (D.C.N.J.1942); United States v. Rose, 215 F.2d 617, 623 (3 Cir. 1954); Weiner v. Commonwealth, 221 Ky. 455, 298 S.W. 1075 (1927).[6] Under 18 U.S.C. § 1001 a person does not answer official questions at his peril. Thus, in United States v. Lattimore, supra, the defendant was charged with having perjured himself before a congressional committee when he denied that he was a "follower of the Communist line" or a "promoter of Communist interests." Dismissing the indictment as unconstitutionally vague the court stated:

"For a jury to conclude that perjury has been committed, in fact, it must determine what the words meant to the defendant at the time he offered them as his testimony, and then conclude that the defendant did not at that time believe in the truth of such testimony according to the meaning he ascribed to the words and phrases he used.

\*    \*    \*    \*    \*    \*

"While the proper test of perjury is subjective, insofar as it is based upon the understanding of the witness himself regarding the words that he used, a criminal prosecution must have certain objective standards. Most often in perjury cases the objective standard is not hard to come by; what the accused considered his statements to mean is not in issue since the words or phrases involved have one clear, accepted and recognized meaning. Here, the phrase 'follower of the Communist line' is subject to varying interpretations. It has no universally accepted definition. The Government has defined it in one way and seeks to impute its definition to the defendant. Defendant has declined to adopt it, offering a definition of his own. It would not necessitate great ingenuity to think up definitions differing from those offered either by the Government or defendant. By groundless surmise only could the jury determine which definition defendant had in mind." 127 F.Supp. at 408, 409.

Statements regarding marital status do not, of course, possess the ineluctable ambiguity of such a phrase as "follower

---

**6.** In prosecutions for perjury or for false representations the problem of interpreting ambiguous statements is frequently merged into the issue of *mens rea.* See United States v. Slutzky, supra; United States v. Hautau, supra; United States v. Rose, supra. If a defendant has not intended, by his statement, to assert the proposition which the Government has proved to be false, then he cannot ordinarily, of course, be said to have "knowingly" uttered a false statement. But to fail to distinguish the problem of interpreting an *ambiguous statement* from that of ascertaining the required *mens rea,* may contribute to the type of confusion which we find in the jury instructions below. The jury was charged that it is false to say that two persons are married if they have agreed to the marriage "only for the sake of repre-senting it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive." Even if this definition of "marriage" were applicable in all contexts—and we do not believe that it is—it does not follow, as the jury may have been led to assume, that if appellants *knew* that their "marriages" were entered into "only for the sake of representing them as such to the outside world, etc.," they also knew that it was a falsehood so to represent themselves to the outside world. The latter conclusion requires the additional premise that appellants knew what the U. S. Department of Justice considered to be a marriage when they made their representations that they were married. This required premise was totally ignored by the court below in its instructions to the jury.

of the Communist line." Nevertheless, it is true that significant variations relative to one's marital status are found in the domestic relations laws of the several states and nations, and occasionally, as here, it may be impossible to determine the truth or falsity of a marital representation absent a specification of the jurisdiction under whose laws the representation is to be made.

We do not suggest that a court must accept as conclusive the meaning which a defendant, in a prosecution such as this, ascribes to the words he has used. If this were the rule to be applied, every person accused of perjury or false representations could assert his understanding of the words used in such a way as to preclude any possibility of conviction. United States v. Lattimore, 127 F. Supp. at 410 n. 21. In a prosecution for perjury or false representation, absent fundamental ambiguity of the kind found in Lattimore, the question of what a defendant meant when he made his representation will normally be for the jury. Seymour v. United States, 77 F.2d 577, 99 A.L.R. 880 (8 Cir.1935). Where, as here, however, no evidence is presented on the question, it is incumbent upon the Government to negative any reasonable interpretation that would make the defendant's statement factually correct.

Here appellant asserts that their marital representations were true under the law of New York. The marriages of both Diogo and Gonzalez were initially arranged in New York. Gonzalez's marriage was celebrated in that jurisdiction. Both appellants were domiciliaries of New York at the time the representations were made to the immigration authorities. It is as reasonable to suppose, therefore, that appellants' statements were made with the New York law in mind as that they were made with the Congressional intent that prompted the enactment of 8 U.S.C. § 1101(a) (27) (A) in mind.

Under the law of New York a defective marriage may be either void or voidable. Voidable marriages are valid for all purposes until annulled by a court of competent jurisdiction. N. Y. Domestic Relations Law, § 7; Houle v. Houle, 100 Misc. 28, 166 N.Y.S. 67, 68 (Sup.Ct.1917); In re Martinez's Estate, 181 N.Y.S. 907 (Sup.Ct.1920); Matturro v. Matturro, 111 N.Y.S.2d 533, 536 (Sup.Ct.1952). Parties to an absolutely void marriage may procure a judicial declaration of nullity, N.Y.Civil Practice Act, § 1132, but as their "marriage" never existed in contemplation of the law, such a declaration effects no change in the unmarried status of the two persons. Houle v. Houle, supra.

The only provisions of the New York statutes which absolutely void a marriage are those contained in Sections 5, 6 and 11 of the Domestic Relations Law. Matturro v. Matturro, supra. Sections 5 and 6 concern incestuous and bigamous marriages. Section 11 provides for the invalidity of a marriage not solemnized as therein required. It is uncertain whether these provisions encompass all grounds for voidity (either as a matter of substantive law or for purpose of conferring jurisdiction upon the courts of the state). See, e. g., N.Y. Domestic Relations Law, § 10; Davidson v. Ream, 97 Misc. 89, 161 N.Y.S. 73, 86–90 (Sup.Ct.1916), aff'd, 178 App.Div. 362, 164 N.Y.S. 1037; Gregg v. Gregg, 133 Misc. 109, 231 N.Y.S. 221 (Sup.Ct.1928). No case has been discovered, however, in which the New York courts have issued a declaration of nullity, as distinguished from the grant of an annulment, because of the absence of contractual intent or because both parties with limited purposes negating their acts entered into a formal marriage relationship.[7] Indeed, the New York

7. Our research reveals but two instances in which the New York courts have granted an annulment upon facts similar to those at bar, Dorgeloh v. Murtha, 92 Misc. 279, 156 N.Y.S. 181 (Sup.Ct.1915) and Amsden v. Amsden, 202 Misc. 391, 110 N.Y.S.2d 307 (Sup.Ct.1952). In each, by operation of the doctrine of "relation back," the decree of annulment was held to render the marriage void *ab initio*. These cases do not support the Government's contention that appellants'

courts have repeatedly held allegedly "sham" or "limited purpose" marriages to be neither void nor voidable, and thus to be dissolvable only by a decree of divorce.[8]

In Gregg v. Gregg, 133 Misc. 109, 231 N.Y.S. 221 (Sup.Ct.1928), the defendant spouse in an action for separation set up, by way of defense and counterclaim, the voidity of the parties' marriage. He alleged that they agreed to go through the "farce and mockery" of a French wedding ceremony with the understanding that they would not cohabit, that the defendant would not contribute to the plaintiff's support, and that he would be free to cohabit with other women. Dismissing the counterclaim, the court stated:

> "In this state the parties to a marriage may not vary or diminish the obligations which the law attaches to the relationship by private agreements between themselves.
>
> \*    \*    \*    \*    \*    \*
>
> "The parties here concededly went through a marriage ceremony. Any private reservations they may have made in regard to their respective obligations under the marital status which resulted are void and of no effect.
>
> \*    \*    \*    \*    \*    \*
>
> "\*    \*    \*    even if it be assumed that the averments of the defense do sufficiently establish the absence of a contractual intention, that would at most give the defendant the right to maintain an annulment action.
>
> "Sections 5 and 6 of the Domestic Relations Law, defining void marriages, include only incestuous marriages and those contracted by a person whose husband or wife by a for-

mer marriage is living. The 'marriage' referred to in the defense is valid until annulled by judicial decree." (231 N.Y.S. at 223–224).

In Erickson v. Erickson, 48 N.Y.S.2d 588 (Sup.Ct.1944) the parties entered into a marriage solely for the purpose of legitimizing a child which subsequently died at birth. It was understood that the marriage would take place only in form and that the parties would never cohabit. Denying the wife's uncontested petition for annulment, the court stated:

> "In view of the fact that the child has died; that marriage was never consummated by cohabitation; that there is no hope of the parties ever living together and creating a family home, we agree  \*    \*    \*  that it would be much better  \*    \*    \*  if some legal termination to this difficult relationship could be had. We reluctantly reach the conclusion that the plaintiff's application must be denied. \*    \*    \* If a fraud has occurred, they are the parties who purposely and intentionally brought it about. It may be unfortunate for them and the public generally that the law governing these conditions does not permit this half-marriage to be wiped out. However, divorces and annulments are only granted in those cases where the law specifically provides therefor, and no stretching of the statutes of this State can possibly be made to include the case here presented." 48 N.Y.S.2d at 589–590.

And see Delfino v. Delfino, 35 N.Y.S.2d 693 (Sup.Ct.1942); Anonymous v. Anonymous, 49 N.Y.S.2d 314 (Sup.Ct.1944);

---

marriages were absolutely void, however, for they contain no suggestion that the parties to the defective marriage relationships might have disregarded their relationships absent the decree of annulment issued by a court of competent jurisdiction.

8. Where the "limited purpose" exists in the mind of only one of the parties to a marriage the marriage is ordinarily held

to be voidable under N. Y. Domestic Relations Law, § 7(4) at the instance of the innocent party. See, e. g., Pastore v. Pastore, 199 Misc. 435, 100 N.Y.S.2d 552 (Sup.Ct.1950); Ernst v. Ernst, 32 N.Y.S. 2d 759 (Sup.Ct.1941); Miodownik v. Miodownik, 259 App.Div. 851, 19 N.Y.S.2d 175 (1940); Lederkremer v. Lederkremer, 173 Misc. 587, 18 N.Y.S.2d 725 (Sup. Ct.1940).

Barker v. Barker, 88 Misc. 300, 151 N. Y.S. 811 (Sup.Ct.1914).

We are not called upon to rule, on the authorities cited above, that neither appellants nor their respective spouses could secure declarations of nullity with respect to their alleged marriages in the New York courts. It is sufficient to hold, as we now do, that the Government has failed, as a matter of law, at the trial below, to sustain its burden of there proving that the marriages were void at the time appellants' representations concerning marital status were made.[9]

The Government argues that even if there has been a failure to prove false representations, we should affirm appellants' convictions on a theory of concealment, which is the stated basis of the majority's position in Lutwak. Even assuming that the variance between pleading and proof did not prejudice appellants' interests, the short answer to the Government's contention is that the trial judge failed entirely to instruct the jury on this theory of the case.[10]

The jury was repeatedly instructed as follows:

"So, the indictment, as I said, is before you and the sole and only question, as I gather from this indictment, from all the testimony in this case for you when you go to your juryroom, you will ask yourselves the question, 'Were these marriages fraudulent or were they not? Were they genuine marriages?'

\* \* \* \* \* \*

"So that that is the whole case before you \* \* \*. If you should find and believe from the evidence that these marriages were sham marriages, not genuine, but entered into solely for the purpose of enabling an alien to get into this country, then, of course, it would be your duty to say so by your verdict in the case."

Findings such those suggested by the trial judge, however, would clearly not justify, by themselves, appellants' convictions for concealment of a material fact. If appellants relied upon the truth of their marital representations under New York law, proof of their ulterior motives in marriage would not be tantamount to proof of willful and knowing concealment of these material facts. Much less would it establish the use of a "trick, scheme or device" to achieve such an objective.

The judgment of the district court is reversed and the cause is remanded with instructions that the indictment be dismissed as to all appellants.

CLARK, Circuit Judge (dissenting).

I am unable to perceive why this case is not precisely governed by Lutwak v.

9. Although the New Jersey authorities are not as numerous as those of New York, no different conclusion would be demanded as to Diogo if we were to consider New Jersey law to be controlling in his case. Cf. e. g., Woodward v. Heichelbeck, 97 N.J.Eq. 253, 128 A. 169; Lindquist v. Lindquist, 130 N.J.Eq. 11, 20 A.2d 325 (1941).

Our holding would not, of course, estop the Government in collateral deportation proceedings from claiming that appellants' marriages were invalid. The proof required to establish that the aliens are illegally in this country is different from that required to convict defendants in a criminal case for making false representations and requires only substantial evidence to support a finding of deportability. Moreover, the standards of validity to be applied are different. In a prosecution for false representation the standard of validity to be applied to a marital representation is, in the first instance, determined by the proper interpretation of the statement itself. The standard of validity to be applied in an exclusion or deportation proceeding, by contrast, is determined by the proper interpretation of federal immigration laws. On the latter issue United States v. Lutwak, supra, is controlling.

10. It would be anomalous to suggest, of course, that defense counsel should have objected to the failure of the trial court to instruct the jury on the elements of an offense which was neither charged in the indictment nor mentioned by government counsel during the trial.

United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, and by our own earlier decision of United States v. Rubenstein, 2 Cir., 151 F.2d 915, cert. denied 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462, cited with approval in Lutwak. In fact the more my brothers protest that there is some (unclear) distinction between the cases, the more they disclose the essential identity. In Lutwak three justices dissented, making essentially the same point my brothers stress, namely, that proof was lacking that the marriages were invalid or at least only voidable where made. But the six-man majority held expressly that the validity of the marriages was immaterial. Among other things Justice Minton said, 344 U.S. 604, at pages 611, 612, 73 S.Ct. 481, at page 486: "Thus, when one of the aliens stated that he was married, and omitted to explain the true nature of his marital relationship, his statement did, and was intended to, carry with it implications of a state of facts which were not in fact true." Why my brothers quote this with apparent approval is not clear, since it is so directly applicable to our present case.

While I cannot discover what distinction my brothers are actually advancing, I gather that they are attempting to fragmentize the facts so as to look for small differences in the representations made by these defendants from those appearing in the earlier cases. They are not successful; for the differences at best are trifling, as well as immaterial on the evidence. Here appellants Diogo and Gonzalez hired defendant Adria Gonzalez to procure for them women who for hire went through sham weddings which were never consummated and by which appellants fooled the immigration authorities as to their marital status and staved off deportation until the true facts were brought out on investigation. What more precise testimony of obviously and knowingly making a false claim against the government could be imagined! And on this basis the laborious attempt to determine the New York law of marriage is without point; whatever ideas these appellants may have had as to that law, they knew enough about the federal law of deportation to make quite an investment in an endeavor to evade it.

I excepted appellant Costa from the above statement because his case is somewhat different from the others. In his case the evidence tends to show that the woman he procured went into the marriage in good faith, without knowledge of his intent, and that the marriage was consummated. How far inner reservations as to intent of only one party to a marriage may be used to show a false claim to secure immigration advantages is a problem. I would not be greatly troubled to accept the view that a marriage thus at least partially valid should not be inquired into further as a matter of public policy. But examining the rationale of the Lutwak and Rubenstein cases, I find stress upon the deportee's intent; hence although the case seems not free from doubt, I am constrained to conclude that Costa, too, was properly convicted on the evidence.

The majority opinion raises question as to the adequacy of the charge by quoting a couple of brief passages out of context. It is not fair thus to dispose of a very long charge coming at the end of several days' trial where the issue as to defendants' intent in the pretended marriages had been made clear and precise. Against this background the charge seems to me without prejudicial error, at least so far as concerns any juror with a modicum of intelligence.

It is to be noted that Adria Gonzalez, the procuress of the women and the pivot about whom the conspiracy revolved, was convicted and sentenced to seven years' imprisonment and has not appealed. So she must do time for a crime which my brothers hold does not exist. But at any rate her business has been validated; and it may be expected that others, too, may take up this occupation, now that a real gap in the immigration laws has been found at hand for convenient exploitation.